**AURORA PACKING COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 89–1513.

United States Court of Appeals, District of Columbia Circuit.

Argued May 1, 1990.

Decided June 12, 1990.

Donald F. Peters, Jr., Chicago, Ill., with whom Thomas T. Cavanaugh, Washington, D.C., was on the brief, for petitioner.

Frederick C. Havard, Attorney, N.L.R.B., with whom Robert E. Allen, Associate Gen. Counsel, and Aileen A. Armstrong, Deputy Associate Gen. Counsel, Washington, D.C., were on the brief, for respondent. Judith A. Dowd, Washington, D.C., also entered an appearance, for respondent.

Before EDWARDS, SILBERMAN and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Aurora Packing Company, an Illinois-based business engaged in the slaughter and meat packing of beef cattle, petitions this court to review and set aside an order of the National Labor Relations Board concluding that the Company violated sections 8(a)(5) and (a)(1) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(5) and (a)(1), by refusing to bargain with a newly-elected bargaining representative for kosher ritual slaughterers working at the Company's plant. The Board, in turn, cross-petitions for enforcement of its order. We think that the evidence does not support the Board's view that these kosher ritual slaughterers are employees of the Company rather than independent contractors. We therefore grant the petition for review and deny the Board's cross-petition for enforcement.

## I.

For more than thirty-five years, Aurora has operated a beef slaughterhouse and packing plant. In the typical slaughtering procedure, the cattle are led from a neighboring livestock yard into the Company's "kill floor." On the kill floor, approximately sixty Company employees shackle, stun, and then kill the cattle by slitting the animals' throats. The workers strip away the hide from the animals and store the carcasses overnight in a refrigerated room. The next morning, federal inspectors examine the carcasses for disease and label the meat as choice, prime, or ungraded. Afterwards, the carcasses are boned and cut into smaller pieces.

In 1985, Aurora reached an agreement with the Chicago Rabbinical Council, an organization that certifies meat as kosher for the Chicago area, under which the Company would begin "kosher kills"—the slaughtering of cattle in accordance with Orthodox Jewish law. According to the agreement, the Rabbinical Council would endorse the Company's kosher kills for a certification fee and would "approve and appoint" rabbis to perform the slaughters. These ritual slaughterers, known as "schoctim," are highly trained graduates of rabbinical colleges and must be certified by a supervising rabbi as competent in the intricate rules of kosher slaughtering. Depending on their degree of training, the schoctim may themselves be rabbis, as is true in this case.

Kosher slaughtering started at Aurora soon after the agreement with the Rabbinical Council, and the specialized business expanded until it represented approximately 60% of all the slaughtering done at the Company. At any given time, the plant is engaged in either kosher kills or non-kosher slaughtering; the Company cannot do both simultaneously. The Company slightly modifies its procedure when it does kosher slaughtering: the regular Company employees lead the cattle into the plant, where a four-man schoctim crew on the kill floor uses special knives to slit the animals' throats without first stunning the cattle. The rabbis then inspect the carcass and its internal organs, particularly the lungs, to determine whether the meat is acceptable under Jewish law. The schoctim mark the acceptable carcasses, and other Company workers store them in refrigerators to chill overnight. The next day, Company employees tag the meat as kosher, and the carcass proceeds to the regular boning and cutting departments. The schoctim start their work at sunrise and typically work about seven or eight hours.

In accordance with its agreement with the Rabbinical Council, the Company pays the schoctim crew—not individual rabbis—two dollars for each animal slaughtered, and guarantees the crew at least 200 dollars per week. At the end of each week, the schoctim present the Company with a tally indicating the total number of animals they slaughtered. The schoctim decide among themselves how the resulting total compensation will be individually divided, and Aurora simply pays the rabbis accordingly. At the schoctim's request, the Company deducts Social Security, federal, and state income taxes. The Company also provides workmen's compensation insurance pursuant to the agreement with the Rabbinical Council. Unlike the other production employees, however, the Company

does not provide the schoctim with paid vacations, holidays, unemployment benefits, health insurance, or retirement plans. And the schoctim must provide their own knives, boots, and aprons—the tools of their trade.

The schoctim are afforded virtually complete discretion in the performance of their tasks. Aurora does not supervise how they do their kills nor question their interpretation of Orthodox Jewish law. They enjoy absolute autonomy in determining whether a carcass meets the kosher rules. Any rabbi, moreover, may be absent from work without prior approval; indeed, the rabbis are free to leave at any time of the day. If the Company disapproves of a particular rabbi's performance, it must express that dissatisfaction to the Rabbinical Council.

In October 1988, the United Food and Commercial Workers International Union Local 100–A filed a petition with the Board to represent the schoctim at Aurora. The Company challenged that petition, arguing that the schoctim were independent contractors rather than "employees." In January 1989, the Board affirmed the Regional Director's rejection of the Company's position. In the ensuing representation election, the four rabbis in the unit voted for the Union. But the Company refused to bargain, reiterating its claim that the schoctim were not its employees. The Board determined that Aurora violated sections 8(a)(5) and (a)(1) of the Act and ordered the Company to bargain with the Union. *See Aurora Packing Co.*, 295 N.L.R.B. No. 129 (July 31, 1989). The Company now seeks review of the Board's determination of employee status, as it can only in the context of challenging the Board order, while the Board cross-petitions for enforcement of its order.

## II.

One might expect—particularly in light of *Chevron* and its progeny—that we would readily defer to the Board's definition of employees in individual cases. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844–45, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984). After all, the line between independent contractors and employees was not an easy one for common law judges to draw, as those of us old enough to have taken Agency as a required course in law school will remember. And the Supreme Court at one time thought that the Board had significant running room in applying the definition of employee under the Act. *See NLRB v. Hearst Publications, Inc.*, 322 U.S. 111, 124, 129–30, 64 S.Ct. 851, 859–60, 88 L.Ed. 1170 (1944). But Congress, in 1947, rejected the reasoning in *Hearst Publications* and directed that "employee" specifically exclude "any individual having the status of an independent contractor." In *NLRB v. United Insurance Co.*, 390 U.S. 254, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968), the Supreme Court recognized that Congress wished the Board and courts to apply general common law agency principles in distinguishing between independent contractors and employees. *See id.* at 256, 88 S.Ct. at 989–90. The Court observed that the Board did not have any special "expertise" as to an issue of "pure agency law," and therefore deference would only be extended to the Board's determination of employee status—an "application of law to fact"—insofar as it made a "choice between two fairly conflicting views" in a particular case. *See id.* at 260, 88 S.Ct. at 991–92. Just recently we said that "[g]overning precedent makes clear that the court is not to extend any great amount of deference" to the Board's conclusion on this issue, *North Am. Van Lines v. NLRB*, 869 F.2d 596, 598 (D.C.Cir.1989) (internal quotation omitted), but we reiterated the caveat from *United Insurance* that we would not disturb the Board's decision if " 'it made a choice between two fairly conflicting views.' " *Id.* at 599 (quoting *United Insurance*, 390 U.S. at 260, 88 S.Ct. at 991–92). *See also Construction, Bldg. Material, Ice & Coal Drivers, Helpers and Inside Employees Union, Local No. 221 v. NLRB*, 899 F.2d 1238, 1241–42 (D.C.Cir. 1990). Deference under the *Chevron* doctrine, then, does not apply here because of the 1947 congressional direction that the

Board and the courts apply the common law of agency to the issue.[1]

█ We cannot say, applying the limited deference called for in these cases, that the Board's decision here is a "choice between two fairly conflicting views." When the Board and courts distinguish between independent contractors and employees under agency common law they generally employ the "right to control" test. "[T]he extent of the actual *supervision* exercised by a putative employer over the 'means and manner' of the workers' performance is the most important element to be considered in determining whether or not one is dealing with independent contractors or employees." *Local 777, Democratic Union Org. Comm., Seafarers Int'l Union v. NLRB,* 603 F.2d 862, 873 (D.C.Cir.1978) (emphasis in original), *reh'g denied,* 603 F.2d at 891 (1979). *See also North Am. Van Lines, Inc.,* 869 F.2d at 599; *Yellow Taxi Co. v. NLRB,* 721 F.2d 366, 374 (D.C.Cir.1983). Rather obviously, the Company has very little to say about the "means and manner" of the schoctim's job performance. When Aurora needs a larger schoctim crew, it asks the *Rabbinical Council* to send additional rabbis to its plant. Conversely, the Company may not discharge a rabbi but may only complain about him to the Rabbinical Council. While on the job, the Company may not even question, let alone control, the rabbis' interpretation of Jewish law or their determinations of whether a certain carcass is acceptable. The schoctim do not require prior Company approval to leave the plant at any time of the day. Work rules are not issued for the schoctim, and they are not subject to Company discipline. Indeed, the Company does not even bother to keep personnel files on any of the rabbis. This unusual freedom for and deference to the judgment of the schoctim stand in sharp contrast to the Company's treatment of its other workers. The schoctim at Aurora are simply outside of. the

hierarchy of control and managerial supervision that are the most critical components of the right to control test.

Even when one goes on to examine the secondary factors we have thought relevant under the right of control test, *see North Am. Van Lines,* 869 F.2d at 599–600, they point to independent contractor status. The schoctim own the tools of their trade, the Company pays them by job rather than time, and their work requires elaborate skill and training. These factors, along with the critical absence of Company authority or supervision, indicate to us very plainly that Aurora had no "right to control" the schoctim at its plant.

█ The Board relies, for its determination of employee status, on the proposition that the schoctim perform tasks that have become an "essential" part of Aurora's business and that Aurora can—by regulating the number of cows brought to slaughter—control the rabbis' income. We think neither of these factors are particularly weighty in this case. To be sure, the Board may legitimately consider whether a worker plays an essential role in a company's business, presumably because the company more likely than not would want to exercise control over such important personnel. *See, e.g., NLRB v. United Insurance Co.,* 390 U.S. at 259, 88 S.Ct. at 991 (identifying as one of the common law considerations the fact that the workers "do not operate their own independent businesses, but perform functions that are an essential part of the company's normal operations."). But we have never intimated that this alone may be the decisive factor in distinguishing between employees and independent contractors. For example, in three relatively recent cases, we addressed the question of whether cab drivers are employees or independent contractors. *See Yellow Taxi Co. v. NLRB,* 721 F.2d 366 (D.C.Cir.1983); *City Cab Co. v. NLRB,* 628 F.2d 261 (D.C.Cir.1980); *Local 777,* 603

---

1. *Chevron* presumes that Congress delegated primarily to executive branch agencies the interpretation of ambiguous terms like "employee," in part because of an agency's expertise, and in part because of the policy role inherent in that function—which the Court thought Congress

prefers the agencies rather than the nonelected judiciary to perform. *See* 467 U.S. at 843–44, 104 S.Ct. at 2781–82. When Congress indicated that it wanted the judge-made common law of agency to govern the construction of "employee," it rejected the basis of these presumptions.

F.2d 862 (D.C.Cir.1978). Cab drivers, of course, are essential to the normal business of a taxi company. Yet in *Yellow Taxi Co.* and *Local 777*, we concluded those cab drivers to be independent contractors because, among other things, the companies did not regulate the drivers' hours, did not insist on the maintenance of a travel log, and provided for the "goodwill" of the drivers to inure to their benefit rather than to the companies'. *See Yellow Taxi Co.*, 721 F.2d at 374–78; *Local 777*, 603 F.2d at 872–80. On the other hand, we thought the drivers in *City Cab Co.* were employees because the company there effectively controlled their hours, passenger selection, wages, dress code, and driving patterns. That the drivers were obviously essential to the company's business played no role in our analysis. *See City Cab Co.*, 628 F.2d at 264–65.

As to petitioner's ability to "control" the schoctim's income by regulating the flow of cattle to the kill floor or shutting down the plant or converting to non-kosher slaughter, we think that argument is rather thin. Any independent contractor can be similarly disadvantaged and thereby, we suppose, influenced by a decline in the business directed to him. But if in order to have such influence the primary operator must slow down, curtail, or fundamentally change its own operation, that is actually no control at all.

\*     \*     \*     \*     \*     \*

We conclude that the evidence does not support the Board's determination that the schoctim are employees of Aurora rather than independent contractors. Accordingly, we grant the Company's petition for review and deny the Board's cross-petition for enforcement of its orders.

*It is so ordered.*