In re Anthony ZOLNER, Debtor.

Bankruptcy No. 93 B 12821.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Oct. 21, 1994.

William L. Needler, Northbrook, IL, for debtor.

David S. Allen, Jacobs Burns Sugarman Orlove & Stanton, Chicago, IL, for CTDU Funds.

JACK B. SCHMETTERER, Bankruptcy Judge.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Health and Welfare Fund and the Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund ("Funds") filed claims herein. They moved for estimation of their claims for the purpose of counting their vote against the debtor's proposed Plan of Reorganization, pursuant to Fed.R.Bankr.P. 3018(a). Following trial thereon, the parties having rested and arguments having been considered, the Court now makes and enters the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. The debtor, Anthony Zolner, operates Titan Trucking Company as a sole proprietorship. Since 1969, Debtor has operated his trucking business in the specialized areas of transporting frozen foods and hazardous wastes. He is presently before this Court in a bankruptcy proceeding under Chapter 11 of the Bankruptcy Code, and his reorganization Plan has been set for confirmation hearing.

2. Debtor was a signatory to a series of collective bargaining agreements with the Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) ("CTDU Union"), under which he was obligated to make health, welfare, and pension contributions to the Funds. Funds' Exhibits 7–10.

3. Under the agreements, Debtor agreed to make health, welfare, and pension contributions to the Funds on behalf of "each regular, casual, emergency or replacement Employee covered by this Agreement who performs any service for the Employer in any day, even when such service is not performed under the terms of this Agreement." See Funds' Ex. 7 at 17 (1979–82 Contract); Ex. 8 at 16 (1982–85 Contract); Ex. 9 at 13 (1985–88 Contract); Ex. 10, Article 16 at p. 13 (1988–91 Contract).

4. The employees covered by the agreements are defined as

all Employees engaged in dock work (other than at over-the-road or long distance terminals coming under the jurisdiction of Local 710) and all Employees engaged in deliveries and pick-ups made on behalf of or to any place of business of any Employer, including the hauling, use, or delivery of any goods, wares, merchandise, materials, or other things not presently covered by a written collective bargaining agreement with any other union affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

Funds' Ex. 7 at p. 22; Ex. 8 at p. 21; Ex. 9 at p. 17; Ex. 10, Art. 23 at p. 17.

5. Under Article 28 of the 1988–91 agreement, the contract remained in force through March 31, 1991. However, under the same article of the contract, the agreement was automatically renewed from year to year unless the employer or the CTDU Union notified the other of its desire to modify the agreement. Funds' Ex. 10 at p. 20.

6. Following expiration of the 1988–91 contract, Debtor did not notify the CTDU Union of his desire for a modification or cancellation of the agreement. Thus, Debtor never withdrew from the agreement and presently remains subject to it. Because Debtor never withdrew, the Funds' claim for withdrawal liability must be estimated at zero.

7. In the mid–1970's, Debtor hired a truck driver named Patrick O'Connor, a member of the CTDU Union. In order to continue to make contributions toward the Funds on behalf of Mr. O'Connor (until his pension with the CTDU Pension Fund vested), Debtor originally signed the foregoing collective bargaining agreement with the CTDU Union.

8. From time to time, Debtor employed other drivers who were members of the CTDU Union and made contributions on their behalf to the Funds. Since 1979, however, Patrick O'Connor was the only member of the CTDU Union employed by Debtor.

9. Debtor has not made any contributions to the Funds on behalf of his truck driver employees who were not members of the CTDU Union.

10. Beginning in 1986, Debtor signed another collective bargaining agreement with the Production Workers Union of Chicago and Vicinity, Local 707, on behalf of all its employees, excluding only office and clerical employees, guards, professionals, and supervisors. Funds' Ex. 18. Debtor has contributed to that union's insurance and severance funds on behalf of his employees. Funds' Ex. 20. Since Debtor never withdrew from the CTDU Union agreement, he thus was responsible to two different unions for union payments due for the same driver employees.

11. In 1989, the Trustees of the CTDU Funds filed a lawsuit in the United States District Court for the Northern District of Illinois for an audit of Debtor's books and records and to collect any delinquent contributions revealed by such audit. This lawsuit was captioned *Trustees of the Chicago Truck Drivers Funds v. Zolner*, No. 89 C 6010, and was assigned to Judge Charles Norgle.

12. On February 12, 1993, Magistrate Judge W. Thomas Rosemond issued a Report and Recommendation in which he recommended that the Funds' motion for summary judgment on its claims for delinquent contributions be granted. Funds' Ex. 1. On March 11, 1993, Judge Norgle adopted this Report and Recommendation of the Magis-

trate Judge. *Id.* However, the amount of liability was never fixed, and no final judgment has been entered.[1] Following the District Court's liability determination, Debtor filed his Chapter 11 petition on June 16, 1993.

13. The Funds' audit of Debtor's payroll records identified a number of individuals as covered employees under Debtor's collective bargaining agreement with the CTDU Union. However, that audit included individuals who were independent contractors not salaried by Debtor and who were not "employees" covered by that agreement.

14. The Funds filed proof of claims herein for delinquent contributions and withdrawal liability on December 20, 1993. Funds' Exs. 1 and 3. The Funds amended these claims on February 4, 1994, to quantify the delinquent contributions sought for the period of 1979 to 1992 as $575,906.34 for the Welfare Fund and $453,406.31 for the Pension fund. The Pension Fund also amended its withdrawal liability claim to specify the amount claimed as $303,488.68. Funds' Exs. 2 and 4. Debtor has objected to all claims by the Funds.

■ 15. The evidence tends to show, subject to actual trial of the claims and final liquidation thereof in the District Court, that all individual drivers who carried loads for Debtor and who received from Debtor tax forms 1099 reporting payments thereto, and did not receive W–2 employment tax forms, are very likely to be found to have been independent contractors, not employees. Those drivers owned and maintained their own trucks, were used by Debtor for shipping of goods on an irregular basis, were paid per job rather than by salary, and no employee withholdings were taken out. Therefore, there is only a very small possibility Debtor will be found to owe the Funds any liability for any of those persons. The Court estimates that small possibility at a nominal 5%.

■ 16. As to those persons who drove loads for Debtor and received W–2 employee reports of earnings, they were employees

---

1. Following completion of the estimation hearing, this Court modified the automatic stay to permit the Funds to seek final judgment before the District Court.

covered under the contract with the Funds. However, only about 45% of the Funds' evidence as to the payments due therefrom was based on actual records of Debtor as to those employees, the rest being estimates without persuasive basis that erroneously assumed the independent contract drivers were covered employees. Therefore, the claims for Pension Fund and Health and Welfare Fund are each estimated at 45% of the claims, plus 5% of the remainder of those claims against the small possibility that some portion may be found valid.

17. Facts stated in the Conclusions of Law will stand as additional Findings of Fact. Any legal conclusions set forth in the Findings of Fact will stand as additional Conclusions of Law.

## CONCLUSIONS OF LAW

### Jurisdiction

1. This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and Rule 2.33 of the Local Rules of the United States District Court for the Northern District of Illinois. Venue of the Debtor's Chapter 11 case and this motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding which this Court may hear and determine under 28 U.S.C. § 157(b)(2)(A), (B), and (O).

### Rule 3018(a) Estimation

■ 2. Debtor's objections to claims of the Funds raises the question as to how much of the claims may be counted from the Funds' vote against Debtor's proposed Plan of Reorganization.[2] Fed.R.Bankr.P. 3018(a) provides in relevant part, "[n]otwithstanding objection to a claim or interest, the court after notice and hearing may temporarily allow the claim or interest in an amount which the court deems proper for the purpose of accepting or rejecting a plan." Under Rule 3018(a), a summary-type hearing is contemplated. Accordingly, this Court only heard about twelve hours of evidence and

argument, although all evidence heard was admissible under evidence rules.

■ 3. The temporary allowance of a claim for voting purposes is committed to this Court's reasonable discretion. *In re Marin Town Center,* 142 B.R. 374, 379 (N.D.Cal.1992); *In re River Capital Corp.,* 155 B.R. 382, 385 (Bankr.E.D.Va.1991); *Matter of Gardinier, Inc.,* 55 B.R. 601, 604 (Bankr.M.D.Fla.1985). Exercise of such discretion must of course be based on reasoned analysis.

### The Collective Bargaining Agreements

■ 4. Debtor was a party to collective bargaining agreements with the CTDU Union under which he was obligated to make health, welfare, and pension contributions to the Funds. These contracts covered the period from April 1, 1982, through March 31, 1991. Under Article 28 of the parties' most recent agreement, the contract remained in force through March 31, 1991, but automatically renewed itself from year to year unless the employer or the CTDU Union notified the other of its desire to modify or cancel the agreement. Following expiration of the contract period, Debtor did not notify the CTDU Union of his desire for such a cancellation or modification, and the agreement has remained in full force and effect through the present time. *See Central States Pension Fund v. Gerber Truck Serv., Inc.,* 870 F.2d 1148, 1156 (7th Cir.1989) (*en banc*) (employer's failure to terminate contract in accordance with its written terms automatically renewed contract).

5. Under the agreement, Debtor agreed to make contributions to the Funds on behalf of "each regular, casual, emergency, or replacement Employee covered by this Agreement. . . ." Article 23, Section 2 of the most recent 1988–91 contract provides that:

> This Agreement shall cover all Employees engaged in dock work ... and all employees engaged in deliveries and pickups made on behalf of or to any place of business or any Employer, including the haul-

---

**2.** Only "[t]he holder of a claim or interest allowed under section 502 ... may accept or reject a plan." 11 U.S.C. § 1126(a). Under § 502(a),

a claim is "deemed allowed, unless a party in interest ... objects." 11 U.S.C. § 502(a).

ing, use, or delivery of any goods, wares, merchandise, materials, or other things not presently covered by a written collective bargaining agreement with any other union affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

6. Despite these contractual obligations, Debtor contends that no obligation to the Funds exists other than for contributions on behalf of one of his employees, Patrick O'Connor, who was a member of the CTDU Union. Debtor points out that since 1986 his other truck drivers were members of Production Workers Union Local 707. Based on that fact, Debtor contends that he is free to ignore his contract with the CTDU Union (and his obligations to the Funds).

7. Debtor's contention is inconsistent with the holding in *Central States Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d at 1149. In *Gerber Truck*, the court held that multi-employer funds (such as the CTDU Union Funds) are "entitled to enforce the writing...." *Id.; accord Central States Pension Fund v. Independent Fruit & Produce Co.*, 919 F.2d 1343, 1348 (8th Cir.1990); *Berry v. Garza*, 919 F.2d 87, 89–90 (8th Cir.1990); *Benson v. Brower's Moving & Storage, Inc.*, 907 F.2d 310, 312–16 (2d Cir.), *cert. denied*, 498 U.S. 982, 111 S.Ct. 511, 112 L.Ed.2d 524 (1990).

8. In *Gerber Truck* (as in this case), the employer signed a collective bargaining agreement agreeing to make benefit contributions on behalf of all drivers represented by the union. As a matter of federal labor law, the union's "representation" of these employees encompassed all bargaining unit employees, so the employer's contractual obligation to the Funds "reached well beyond ... *members* of the union." 870 F.2d at 1150 (emphasis in original). The employer there wished to limit its liability for employee benefits to three of its eighteen employees who were union members, so it struck a deal with the union business agent to ignore the writings and limit its obligations to only those three employees. The plans discovered the actual number of employees covered by the collective bargaining agreement through audit of the employer's records, and sued to collect the contributions owed on behalf of those employees.

9. The Seventh Circuit held in *Gerber Truck* that, even if an employer's defense to the enforcement of a collective bargaining agreement relates "to a defect in its formation—such as fraud in the inducement, oral promises to disregard the text, or the lack of majority support for the union and the consequent ineffectiveness of the pact under labor law—it must still keep its promise to the pension plans." 870 F.2d at 1153. "Defenses based on fraud in the inducement, oral side agreement, course of performance, want of consideration, failure of the union to have majority support," the Court observed, "are as a class the defenses *most* likely to breed litigation even when asserted in good faith, and they create manifold opportunities for manipulation by crafty operators." *Id.* at 1154 (emphasis in original).

10. The Seventh Circuit recently reiterated its *Gerber Truck* holdings in *Central States Pension Fund v. Joe McClelland, Inc.*, 23 F.3d 1256 (7th Cir.1994). There an employer (OK Coal and Concrete Company) signed a contract agreeing to make pension contributions on behalf of its "drivers," but only remitted such contributions on behalf of its drivers who were members of the Teamsters Union. OK Coal argued that it had an understanding with the union, under which its obligation was limited to making contributions only on behalf of union members. The Seventh Circuit rejected this argument, reasoning "[e]mployers may not distinguish between members of a bargaining unit who belong to the union and those who do not." *Id.* at 1258 (relying on 29 U.S.C. § 158(a)(3). "Terms that are lawful as written may not be given an illegal spin as part of an effort to curtail the obligation they create." *Id.*

11. The same result follows in this case. Debtor signed a collective bargaining agreement with the CTDU Union in which he agreed to contribute to the Funds on behalf of his drivers. Many of Debtor's drivers are members of Production Workers Union Local 707 or are not affiliated with any union, so Debtor ignored his written contractual obligation to the Funds. The *Gerber Truck* decision establishes that Debtor's "wish to set

the terms on which he will deal with a pension trust" by unilaterally limiting his obligation to only those employees who are members of the union is not an option open to him. 870 F.2d at 1156. Indeed, by contracting with two unions, Debtor entered a trap of his own making and remains liable under both agreements.

### Independent Contractors Not Covered by the Agreement

■■■■ 12. Debtor also contends that many individuals identified by the Funds were and are independent contractors on whose behalf no contributions are owed under the agreement. As a matter of federal labor law, courts have spelled out a number of factors to be considered in making the determination as to whether an individual is an employee or an independent contractor. *See generally Construction Bldg. Material Local No. 221 v. NLRB*, 899 F.2d 1238, 1242 (D.C.Cir.1990) (Ginsberg, J.); *North American Van Lines, Inc. v. NLRB*, 869 F.2d 596, 599–600 (D.C.Cir.1989); *NLRB v. Amber Delivery Serv., Inc.*, 651 F.2d 57, 61 (1st Cir. 1981) (Breyer, J.). Of primary importance is the putative employer's right to control the "means and manner" of the individual's job performance. *Construction Bldg. Material Local No. 221*, 899 F.2d at 1242.[3] Nevertheless, when deciding whether an individual is an employee or independent contractor, the determination ultimately depends upon review of "all of the incidents of the relationship ... with no one factor being decisive." *Amber Delivery Serv., Inc.*, 651 F.2d at 61 (quoting *NLRB v. United Ins. Co.*, 390 U.S. 254, 258, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968)). Courts have thus also considered the nature of the parties' understanding; whether the worker assumes entrepreneurial risk or opportunity for profit; whether the worker has an ownership interest in the "tools of the trade;" whether the worker is paid on a per job basis or by salary; local business practices regarding supervision of such activities; the degree of skill the work requires; and, finally, the treatment and benefits the employer provides the worker in question, in comparison to other workers who fit the more traditional definition of "employee." *North American Van Lines, Inc.*, 869 F.2d at 599; *Amber Delivery Serv., Inc.*, 651 F.2d at 61.

For purposes of this estimation hearing, this Court need not review the circumstances of each individual who worked for Debtor. However, from the evidence received it is clear that many drivers for Debtor were and are independent contractors. It appears very likely that at the final trial of these issues that all of those drivers who received 1099 tax forms from Debtor will be found independent contractors, not covered employees.

### Unreliable Projection Evidence

■■■■ 13. Debtor also challenges the Funds' calculation of the delinquent contributions owed on the ground that it is based on estimates and extrapolations. The Funds were entitled at this estimation hearing to supply evidence of projections by a knowledgeable expert for the purpose of helping the Court to estimate their claims. However, much of that evidence was not based on a review of actual records or interviews or investigation of particular drivers, and that evidence was found to be wholly unreliable even for purposes of this hearing to prove employee relationships as to many individuals. The contrary testimony of Debtor as to the nature of those relationships support a finding that such persons were independent contractors. Debtor's testimony in that regard was precise and credible, and he rebutted any slight weight that might otherwise be attributed to the purely projective evidence offered by the Funds.

### The Withdrawal Claim

■■■ 14. The Pension Fund has also filed a proof of claim for withdrawal liability under

---

**3.** There are significant limits, however, upon which of an employer's actions evidence "control" over the means and manner of performance. *North American Van Lines, Inc.*, 869 F.2d at 599. Most importantly, employer efforts to monitor, evaluate, and improve the results or ends of the worker's performance do not necessarily transform the worker into an employee. *See Id.* Employer efforts to ensure a worker's compliance with government regulations also do not always require a finding of employee status. *Id.* Finally, evidence of unequal bargaining power, without more, does not weigh in favor of finding employee status. *Id.*

the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by the Multiemployer Pension Plan Amendment Act of 1980 ("MPPAA"), 29 U.S.C. § 1383. ERISA's withdrawal liability provision were recently explained by the United States Supreme Court in *Concrete Pipe & Products of California v. Construction Laborers Pension Trust for Cal.,* —— U.S. ——, ——, 113 S.Ct. 2264, 2272, 124 L.Ed.2d 539 (1993):

> Under certain provisions of the MPPAA . . . if an employer withdraws from a multiemployer plan, it incur "withdrawal liability" in the form of "a fixed and certain debt to the pension plan." [*Pension Benefit Guaranty Corp. v. R.A.] Gray [ & Co.],* 467 U.S. [717], 725 [104 S.Ct. 2709, 2715, 81 L.Ed.2d 601] ['(1984) ]. An employer's withdrawal liability is its "proportionate share of the plan's 'unfunded vested benefits,' " that is, "the difference between the present value of vested benefits" (benefits that are currently being paid to retirees and that will be paid in the future to covered employees who have already completed some specified period of service, 29 U.S.C. § 1053) "and the current value of the plan's assets. 29 U.S.C. §§ 1381, 1391." *Gray, supra,* 467 U.S. at 725 [104 S.Ct. at 2715].

15. The MPPAA details the method for computing and assessing withdrawal liability. The Plan's actuary, who is subject to regulatory and professional standards, 29 U.S.C. §§ 1241, 1242; 26 U.S.C. § 7701(a)(35), assumed that Debtor had in fact withdrawn. He sought to determine the present value of the Plan's liability for vested benefits, applying "actuarial assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan. . . ." 29 U.S.C. § 1393(a)(1).

16. An employer is assessed withdrawal liability by the "plan sponsor" (here the Funds' trustees, *see* 29 U.S.C. § 1301(a)(10)(A)), issuing a notice of the amount of the withdrawal liability, the employer's schedule of payments, and a demand for payment. 29 U.S.C. §§ 1382, 1399(b)(1).

17. Here, the Funds served Debtor with their withdrawal liability claim on February 4, 1994. Funds' Ex. 4.

18. The standard for rebutting a withdrawal liability claim is contained in 29 U.S.C. § 1401(a)(3)(A), which provides that "any determination made by a plan sponsor under [§§ 1381–1399 and 1405] is presumed correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous." This language means that the employer must "disprove a [plan sponsor's] challenged factual determination by a preponderance" of the evidence. *Concrete Pipe & Products of Cal.,* —— U.S. at ——, 113 S.Ct. at 2283.

19. The foregoing statutory and regulatory scheme is predicated wholly on the assumption that an employer actually withdrew from the Funds. Here, Debtor will clearly meet his burden to defeat withdrawal liability. Debtor never withdrew, and therefore the withdrawal claim must fail. Indeed, the other Fund claims found partially valid are based on continuing liability under the agreement, and assume that there was never any withdrawal. Those Fund claims estimated to be partially valid are inconsistent legally and factually with the withdrawal claim. Accordingly, claimants' withdrawal claim is necessarily estimated at zero.

## CONCLUSION

The full claims filed herein by the Chicago Truck Drivers Helpers and Warehouse Union Health and Welfare Fund and the Chicago Truck Drivers and Helpers Pension Funds ("CTU Funds"), which claims were all disputed by the Debtor, are as follows:

a. Delinquent contributions for 1979 to 1992 for $575,906.34 were sought for the Health and Welfare Fund;

b. Delinquent contribution for 1979 to 1992 for $453,406.31 for the Pension Fund;

c. Withdrawal liability for the Pension Fund of $303,488.68.

The Court concludes that those claims are estimated under Fed.R.Bankr.P. 3018(a) as follows:

1. No withdrawal liability of the Debtor exists, and the claim for such liability is estimated at zero;

2. The liability of the Debtor as to Health and Welfare is estimated at 45% or $329,400.00.

3. The liability of the Debtor as to the Pension Fund is estimated at 45% or $260,100.00;

4. As to the balance or the remainder of each such claim, the claim is estimated at an additional 5% as follows:

a. Health and Welfare Fund ($575,906.34—$329,400.00 or $264,506.34 × 5% = $12,325.32);

b. Pension Fund ($453,406.31—$260,100.00 or $9,665.31).

5. That therefore the total unsecured claims of the Funds in these proceedings are estimated by separate order under Fed. R.Bankr.P. 3018(a) as:

a. Health and Welfare Fund of $341,725.32, plus

b. Pension Fund of $269,765.32.

Therefore, by separate Order the Fund claims are estimated at a total of $611,490.64 under Rule 3018(a) for the purpose of counting the vote of the Funds against Debtor's Plan of Reorganization.