# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 7, 2008          Decided April 21, 2009

No. 07-1391

FEDEX HOME DELIVERY, A SEPARATE OPERATING DIVISION
OF FEDEX GROUND PACKAGE SYSTEM, INCORPORATED,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL NO.
25,
INTERVENOR

———

Consolidated with 07-1436

———

On Petition for Review and Cross-Application for
Enforcement of an Order of the National Labor
Relations Board

———

*R. Ted Cruz* argued the cause for petitioner. On the briefs
were *Charles I. Cohen*, *Jonathan C. Fritts*, and *Doreen S.
Davis*.

*Robert Digges Jr.*, *Robin S. Conrad*, and *Adam C. Sloane* were on the brief for *amici curiae* American Trucking Associations, Inc. and Chamber of Commerce of the United States of America in support of petitioner. *Timothy W. Wiseman* entered an appearance.

*Kellie J. Isbell*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *Ronald E. Meisburg*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Robert J. Englehart*, Supervisory Attorney. *Julie B. Broido*, Supervisory Attorney, entered an appearance.

*Renee J. Bushey* argued the cause for intervenor International Brotherhood of Teamsters, Local No. 25. With her on the brief were *Michael A. Feinberg* and *Jonathan M. Conti*.

*Daniel J. Popeo* and *Richard A. Samp* were on the brief for *amici curiae* Washington Legal Foundation, et al. in support of respondent.

Before: GARLAND and BROWN, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* BROWN.

Opinion dissenting in part filed by *Circuit Judge* GARLAND.

BROWN, *Circuit Judge*: FedEx Ground Package System, Inc. ("FedEx"), a company that provides small package delivery throughout the country, seeks review of the determination of the National Labor Relations Board

("Board") that FedEx committed an unfair labor practice by refusing to bargain with the union certified as the collective bargaining representative of its Wilmington, Massachusetts drivers. The Board cross-applies for enforcement of its order. Because the drivers are independent contractors and not employees, we grant FedEx's petition, vacate the order, and deny the cross-application for enforcement

I.

In 1998, FedEx acquired Roadway Package Systems and changed its name to FedEx Ground Package System, Inc. The company has two operating divisions: the Ground Division and the Home Delivery Division or FedEx Home. The Ground Division delivers packages of up to 150 pounds, principally to and from business customers. FedEx Home delivers packages of up to 75 pounds, mostly to residential customers. The Wilmington terminals are part of FedEx Home, a network that operates 300 stand-alone terminals throughout the United States and shares space in an additional 200 Ground Division facilities. FedEx Home has independent contractor agreements with about 4,000 contractors nationwide with responsibility for over 5,000 routes.

In July 2006, the International Brotherhood of Teamsters, Local Union 25, filed two petitions with the NLRB seeking representation elections at the Jewel Drive and Ballardvale Street terminals in Wilmington, neither of which boasts many contractors. The Union won the elections, prevailing by a vote of 14 to 6 at Jewel Drive and 10 to 2 at Ballardvale Street, and was certified as the collective bargaining representative at both. FedEx refused to bargain with the Union. The company did not contest the vote count; instead, FedEx disputed the preliminary finding that its single-route drivers are "employees" within the meaning of Section 2(3) of the National Labor Relations Act, 29 U.S.C. § 152(3).

The Board rejected FedEx's Request for Review of the Regional Director's Decision and Direction of Election on November 8, 2006. In dissent, Chairman Battista disagreed with "the refusal to permit [FedEx] to introduce system-wide evidence concerning the number of route sales and the amount of profit," as the information would be relevant to the determination of the drivers' "entrepreneurial interest in their position." *FedEx Home Delivery and Local 25*, N.L.R.B. Case Nos. 1-RC-22034, 22035, (Nov. 8, 2006) (Battista, C., dissenting). After the election, the Board found FedEx violated Sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (5), by refusing to bargain. Finding FedEx's objection that its contractors are not employees had been raised and rejected in the representation proceedings, the Board issued its order on September 28, 2007. FedEx filed a timely petition for review and the Board filed its cross-application for enforcement. The Union intervened in support of the Board's cross-application.

## II.

To determine whether a worker should be classified as an employee or an independent contractor, the Board and this court apply the common-law agency test, a requirement that reflects clear congressional will. *See NLRB v. United Ins. Co.*, 390 U.S. 254, 256 (1968); *see also St. Joseph News Press*, 345 N.L.R.B. 474, 478 (2005) ("Supreme Court precedent 'teaches us not only that the common law of agency is the standard to measure employee status *but also that we have no authority to change it*.'") (quoting *Dial-A-Mattress Operating Corp.*, 326 N.L.R.B. 884, 894 (1998)). While this seems simple enough, the Restatement's non-exhaustive ten-factor test is not especially amenable to any sort of bright-line

rule,[1] a long-recognized rub.[2] Thus, "there is no shorthand formula or magic phrase that can be applied to find the answer, but all of the incidents of the relationship must be assessed and weighed with no one factor being decisive," *United Ins. Co.*, 390 U.S. at 258, always bearing in mind the "legal distinction between 'employees' . . . and 'independent contractors' . . . is permeated at the fringes by conclusions drawn from the factual setting of the particular industrial dispute." *North Am. Van Lines, Inc. v. NLRB,* 869 F.2d 596, 599 (D.C. Cir. 1989) ("*NAVL"*).

This potential uncertainty is particularly problematic because the line between worker and independent contractor is jurisdictional—the Board has no authority whatsoever over independent contractors. *See id.* at 598. Consequently, it is "one of this court's principal functions" to "ensur[e] that the Board exercises power only within the channels intended by Congress," especially as determining status from undisputed

---

[1] The common law factors include, *inter alia*, "the extent of control which, by the agreement, the master may exercise over the details of the work"; "the kind of occupation"; whether the worker "supplies the instrumentalities, tools, and the place of work"; "the method of payment, whether by the time or by the job"; "the length of time for which the person is employed"; whether "the work is a part of the regular business of the employer"; and the intent of the parties. RESTATEMENT (SECOND) OF AGENCY § 220(2).

[2] *See Kisner v. Jackson*, 159 Miss. 424, 427–28 (1931) ("There have been many attempts to define precisely what is meant by the term 'independent contractor'; but the variations in the wording of these attempts have resulted only in establishing the proposition that it is not possible within the limitations of language to lay down a concise definition that will furnish any universal formula, covering all cases. At last, and in any given case, it gets back to the original proposition whether in fact the contractor was actually independent.").

facts "involves no special administrative expertise that a court does not possess." *Id.* We thus do not grant great or even "normal[]" deference to the Board's status determinations; instead, we will only uphold the Board if at least "it can be said to have 'made a choice between two fairly conflicting views.'" *C.C. Eastern, Inc. v. NLRB,* 60 F.3d 855, 858 (D.C. Cir. 1995) (quoting *NAVL*, 869 F.2d at 599).

For a time, when applying this common law test, we spoke in terms of an employer's right to exercise control, making the extent of actual supervision of the means and manner of the worker's performance a key consideration in the totality of the circumstances assessment. Though all the common law factors were considered, the meta-question, as it were, focused on the sorts of controls employers could use without transforming a contractor into an employee. *E.g.*, *NAVL*, 869 F.2d at 599 ("In applying traditional agency law principles, the NLRB and the courts have adopted a right-to-control test. The test requires an evaluation of all the circumstances, but the extent of the actual *supervision* exercised . . . is the most important element."). For example, "efforts to monitor, evaluate, and improve" a worker's performance were deemed compatible with independent contractor status. *Id.* Nor would "restrictions" resulting from "government regulation" mandate a contrary conclusion. *Id.* "[E]vidence of unequal bargaining power" also did not establish "control." *Id.*

Gradually, however, a verbal formulation emerged that sought to identify the essential quantum of independence that separates a contractor from an employee, a process reflected in cases like *C.C. Eastern* and *NAVL* where we used words like control but struggled to articulate exactly what we meant by them. "Control," for instance, did not mean *all* kinds of controls, but only *certain* kinds. *See, e.g.*, *C.C. Eastern*, 60

F.3d at 858 (quoting *NAVL*, 869 F.2d at 599). Even though we were sufficiently confident in our judgment that we reversed the Board, long portions of both opinions were dedicated to explaining why some controls were more equal than others. *See id.* at 858–61; *NAVL*, 869 F.2d at 599–604. In other words, "control" was close to what we were trying to capture, but it wasn't a perfect concurrence. It was as if the sheet music just didn't quite match the tune.

In any event, the process that seems implicit in those cases became explicit—indeed, as explicit as words can be—in *Corporate Express Delivery Systems v. NLRB,* 292 F.3d 777 (D.C. Cir. 2002). In that case, both this court and the Board, while retaining all of the common law factors, "shift[ed the] emphasis" away from the unwieldy control inquiry in favor of a more accurate proxy: whether the "putative independent contractors have 'significant entrepreneurial opportunity for gain or loss.'" *Id.* at 780 (quoting *Corp. Express Delivery Sys.*, 332 N.L.R.B. No. 144, at 6 (Dec. 19, 2000)). This subtle refinement was done at the Board's urging in light of a comment to the Restatement that explains a "'full-time cook is regarded as a servant,'"—and not "an independent contractor"—"'although it is understood that the employer will exercise no control over the cooking.'" *Id.* (quoting RESTATEMENT (SECOND) OF AGENCY § 220(1) cmt. d). Thus, while all the considerations at common law remain in play, an important animating principle by which to evaluate those factors in cases where some factors cut one way and some the other is whether the position presents the opportunities and risks inherent in entrepreneurialism. *Id.*[3]

---

[3] The common law test, after all, is not merely quantitative. We do not just count the factors that favor one camp, and those the other, and declare that whichever side scores the most points wins. Instead, there also is a qualitative assessment to evaluate which factors are determinative in a particular case, and why. In

Although using this "emphasis" does not make applying the test purely mechanical, the line drawing is easier, or at least this court and the Board in *Corporate Express* seem to have so hoped. *See id.* ("We agree with the Board's suggestion that [entrepreneurial opportunity] better captures the distinction between an employee and an independent contractor."). In *C.C. Eastern*, for instance, we decided drivers for a cartage company who owned their own tractors, signed an independent contractor agreement, "retain[ed] the rights, as independent entrepreneurs, to hire their own employees" and could "use their tractors during non-business hours," and who were "paid by the job" and received no employee benefits, should be characterized as independent contractors. 60 F.3d at 858–59. We also noted the company did not require "specific work hours" or dress codes, nor did it subject workers to conventional employee discipline. *Id.* at 858. Conversely, in *Corporate Express,* emphasizing entrepreneurialism, we straightforwardly concluded that where the owner-operators "were not permitted to employ others to do the Company's work or to use their own vehicles for other jobs," they "lacked all entrepreneurial opportunity and consequently functioned as employees rather than as independent contractors." 292 F.3d at 780–81.

This struggle to capture and articulate what is meant by abstractions like "independence" and "control" also seems to play a part in the Board's own cases, though we readily concede the Board's language has not been as unambiguous as this court's binding statement in *Corporate Express*. For

---

*Corporate Express*, we said this qualitative evaluation "focus[es] not upon the employer's control of the means and manner of the work but instead upon whether the putative independent contractors have a 'significant entrepreneurial opportunity for gain or loss.'" 292 F.3d at 780 (quoting *Corp. Express*, 332 N.L.R.B. at 6).

instance, in the latest but far from only statement of the principle, *see St. Joseph News Press*, 345 N.L.R.B. at 479; *Dial-A-Mattress Operating Corp.*, 326 N.L.R.B. at 891; *cf. Panhandle E. Pipe Line Co. v. FERC*, 890 F.2d 435, 438–39 (D.C. Cir. 1989) (agency action while review is pending in this court can be relevant), and a case where the Board explicitly said it was simply following its own precedent, *Arizona Republic*, 349 N.L.R.B. 1040, 1040 (2007), the Board held that where carriers sign an independent contractor agreement; own, maintain, and control their own vehicles; hire full-time substitutes and control the substitutes' terms and conditions of employment; are permitted to hold contracts on multiple routes; select the delivery sequence; and are not subject to the employer's progressive discipline system, the evidence establishes that the carriers are independent contractors, *id.* at 1040–41, 1046. Importantly, the Board, noting many drivers had "multiple routes" and could deliver newspapers for another publisher, also concluded significant entrepreneurial opportunity existed, even if most failed to make the extra effort. "[T]he fact that many carriers choose not to take advantage of this opportunity to increase their income does not mean that they do not have the entrepreneurial *potential* to do so." *Id.* at 1045.

The record here shares many of the same characteristics of entrepreneurial potential.[4] In the underlying representation decision, the Regional Director found the contractors sign a

---

[4] FedEx also does not provide benefits or withhold taxes. While unrelated to entrepreneurialism, this goes to party intent. *See C.C. Eastern*, 60 F.3d at 858–59; *St. Joseph News Press*, 345 N.L.R.B. at 479.("[A] party's intent with regard to the nature of the relationship created weighs strongly in favor of finding independent contractor status."). Because we consider *all* the common law factors, *vide supra*, these facts are relevant, just as are any relating to control.

Standard Contractor Operating Agreement that specifies the contractor is not an employee of FedEx "for any purpose" and confirms the "manner and means of reaching mutual business objectives" is within the contractor's discretion, and FedEx "may not prescribe hours of work, whether or when the contractors take breaks, what routes they follow, or other details of performance"; "contractors are not subject to reprimands or other discipline"; contractors must provide their own vehicles, although the vehicles must be compliant with government regulations and other safety requirements; and "contractors are responsible for all the costs associated with operating and maintaining their vehicles." *FedEx Home Delivery and Local 25*, N.L.R.B. Case Nos. 1-RC-22034, 22035, slip op. at 10–14 (First Region, Sept. 20, 2006) ("*Representation Decision*"). They may use the vehicles "for other commercial or personal purposes . . . so long as they remove or mask all FedEx Home logos and markings," and, even on this limited record, some do use them for personal uses like moving family members, and in the past "Alan Douglas[] used his FedEx truck for his 'Douglas Delivery' delivery service, in which he delivered items such as lawn mowers for a repair company." *Id.* at 14, 15. Contractors can independently incorporate, and at least two in Wilmington have done so. At least one contractor has negotiated with FedEx for higher fees. *Id.* at 20.[5]

---

[5] We recognize FedEx seeks to "make full use of the Contractor's equipment," but it is undisputed the contractors are only obligated to provide service five days a week. Our precedent speaks to this: "Moreover, as the drivers work only 40 to 50 hours per week for the Company, it seems that their schedules do not preclude them from taking on additional hauling business during their off-hours." *C.C. Eastern*, 60 F.3d at 860. Though our colleague contends *C.C. Eastern* does not say very much, *see* Dis. Op. at 26 ("But all *C.C. Eastern* held was that under those circumstances, the Board had erred in 'discounting to zero' the significance of that single factor

Tellingly, contractors may contract to serve multiple routes or hire their own employees for their single routes; more than twenty-five percent of contractors have hired their own employees at some point. *See* Resp'ts Br. at 6. "The multiple route contractors have sole authority to hire and dismiss their drivers"; they are responsible for the "drivers' wages" and "all expenses associated with hiring drivers, such as the cost of training, physical exams, drug screening, employment taxes, and work accident insurance." *Representation Decision*, slip op. at 27.[6] The drivers' pay and benefits, as well as responsibility for fuel costs and the like, are negotiated "between the contractors and their drivers." *Id.* In addition, "both multiple and single route contractors may hire drivers" as "temporary" replacements on their own routes; though they can use FedEx's "Time Off Program" to find replacement drivers when they are ill or away, they need not use this program, and not all do. *Id.* at 28–29. Thus, contrary to the dissent's depiction, Dis. Op. at 19, contractors

in the traditional multi-factor test."), he fails to account for the holding. We did not remand for the Board to give this factor the proper weight, but instead held the contractors "are not 'employees' within the meaning of the Act and therefore are not within the jurisdiction of the Board." *C.C. Eastern*, 60 F.3d at 861.

[6] We are aware the Regional Director excluded contractors with multiple routes from the bargaining units as statutory supervisors, even though the "employees" of those "supervisors" do not, in fact, work for FedEx. *Representation Decision*, slip op. at 42–43. This classification is not before us. But what *is* before us is the puzzling argument, adopted but not defended by our colleague, *see* Dis. Op. at 23, that because they were excluded, everything about them is somehow irrelevant, as if—poof!—they just vanished. Multi-route contractors signed the same contract as the others, and just as the national data is relevant in assessing the rights available under the contract, *id.* at 27–30, so are the activities of these contractors.

do not need to show up at work every day (or ever, for that matter); instead, at their discretion, they can take a day, a week, a month, or more off, so long as they hire another to be there. "FedEx [also] is not involved in a contractor's decision to hire or terminate a substitute driver, and contractors do not even have to tell FedEx [] they have hired a replacement driver, as long as the driver is 'qualified.'" *Representation Decision*, slip op. at 29. "Contractors may also choose to hire helpers" without notifying FedEx at all; at least six contractors in Wilmington have done so. *Id.* at 29–30. This ability to hire "others to do the Company's work" is no small thing in evaluating "entrepreneurial opportunity." *Corp. Express,* 292 F.3d at 780–81; s*ee also St. Joseph News Press*, 345 N.L.R.B. at 479 ("Most importantly, the carriers can hire full-time substitutes . . . .").

Another aspect of the Operating Agreement is significant, and is novel under our precedent. Contractors can assign at law their contractual rights to their routes, without FedEx's permission. The logical result is they can sell, trade, give, or even bequeath their routes, an unusual feature for an employer-employee relationship. In fact, the amount of consideration for the sale of a route is negotiated "strictly between the seller and the buyer," with no FedEx involvement at all other than the new route owner must also be "qualified" under the Operating Agreement, *Representation Decision*, slip op. at 30, with "qualified" merely meaning the new owner of the route also satisfies Department of Transportation ("DOT") regulations, s*ee id.* at 8–10. Although FedEx assigns routes without nominal charge, the record contains evidence, as the Regional Director expressly found, that at least two contractors were able to sell routes for a profit ranging from $3,000 to nearly $16,000. *See id.* at 30–32, 38–39.

In its argument to this court, the Board, echoed by the dissent, discounts this evidence of entrepreneurial opportunity by saying any so-called profit merely represents the value of the vehicles, which were sold along with the routes. But if a vehicle depreciates in value, it is not worth as much as it was before; that is tautological. Here, buyers paid more for a vehicle and route than just the depreciated value of the vehicle—in one instance more than $10,000 more. Therefore, as the Regional Director did, we find this value *is* profit. *Compare Representation Decision*, slip op. at 38 ("Neal's profit on the sale of his route was only $3000 to $6000," and "[a]fter deducting the value of the truck . . . it appears that, at best, Ferreira paid Jung somewhere between $11,000 and $16,000 for the route.") *with* Dis. Op. at 24 (suggesting no "gain at all" may have been shown). The *amount* of profit may be "murky," as it may be as high as $6,000 and $16,000 or as low as $3,000 or $11,000, respectively, but the profit is real. *Representation Decision*, slip op. at 38. That this potential for profit exists is unsurprising: routes are geographically defined, and they likely have value dependent on those geographic specifics which some contractors can better exploit than others. For example, as people move into an area, the ability to profit from that migration varies; some contractors using more efficient methods can continue to serve the entire route, while others cannot.

It is similarly confused to conclude FedEx gives away routes for free. *See* Dis. Op. at 23. A contractor agrees to provide a service in return for compensation, i.e., both sides give consideration. If a contractor does not do what she says, FedEx suffers damages, just as she does if FedEx does not pay what is owed. Servicing a route is not cheap; one needs a truck (which the contractor pays for) and a driver (which the contractor also pays for, either directly or in kind). To say this is giving away a route is to say when one hires a

contractor to build a house, one is just giving away a construction opportunity. All of this evidence thus supports finding these contractors to be independent.

The Regional Director, however, thought FedEx's business model distinguishable from those where the Board had concluded the drivers were independent contractors. For example, FedEx requires: contractors to wear a recognizable uniform and conform to grooming standards; vehicles of particular color (white) and within a specific size range; and vehicles to display FedEx's logo in a way larger than that required by DOT regulations. The company insists drivers complete a driving course (or have a year of commercial driving experience, which need not be with FedEx) and be insured, and it "conducts two customer service rides per year" to audit performance. FedEx provides incentive pay (as well as fuel reimbursements in limited instances) and vehicle availability allotments, and requires contractors have a vehicle and driver available for deliveries Tuesday through Saturday. *Id.* at 9–21. Moreover, FedEx can reconfigure routes if a contractor cannot provide adequate service, though the contractor has five days to prove otherwise, and is entitled to monetary compensation for the diminished value of the route. *Id.* at 16. These aspects of FedEx's operation are distinguishable from the business models in *Dial-A-Mattress*, 326 N.L.R.B. 884 (contractors arranged their own training, could decline work, did not wear uniforms, could use any vehicle, and were provided no subsidies or minimum compensation) and *Argix Direct, Inc.*, 343 N.L.R.B. 1017 (2004) (contractors could decline work, delivered to major retailers using any vehicle, and had no guaranteed income).

But those distinctions, though not irrelevant, reflect differences in the type of service the contractors are providing rather than differences in the employment relationship. In

other words, the distinctions are significant but not sufficient. FedEx Home's business model is somewhat unique. The service is delivering small packages, mostly to residential customers. Unlike some trucking companies, its drivers are not delivering goods that FedEx sells or manufacturers, nor does FedEx move freight for a limited number of large clients. Instead, it is an intermediary between a diffuse group of senders and a broadly diverse group of recipients. With this model comes certain customer demands, including safety. As the Internal Revenue Service ("IRS") persuasively notes, and ordinary experience confirms, a uniform requirement often at least in part "is intended to ensure customer security rather than to control the [driver]." INTERNAL REVENUE SERVICE, EMPLOYMENT TAX GUIDELINES: CLASSIFYING CERTAIN VAN OPERATORS IN THE MOVING INDUSTRY 23, http://www.irs.gov/pub/irs-utl/van-ops.pdf (last visited April 3, 2009).[7] And once a driver wears FedEx's logo, FedEx has an interest in making sure her conduct reflects favorably on that logo, for instance by her being a safe and insured driver—which is required by DOT regulations in any event. *See Representation Decision*, slip op. at 8–9, 14, 24.

We have held that constraints imposed by customer demands and government regulations do not determine the employment relationship. *See C.C. Eastern*, 60 F.3d at 859 ("[W]here a company's control over an aspect of the workers' performance is motivated by a concern for customer service, that control does not suggest an employment relationship.");

---

[7] We, of course, are *not* deferring to the IRS. *See* Dis. Op. at 15 n.10. Our standard of review here is unusual. Though not *de novo*, we must enforce the bounds on the Board's jurisdiction set by Congress. *NAVL*, 869 F.2d at 598. This statement is merely persuasive authority that is relevant in light of our precedent that measures springing from customer demands do not create an employee relationship. *C.C. Eastern*, 60 F.3d at 859.

*NAVL*, 869 F.2d at 599 ("[E]mployer efforts to monitor, evaluate, and improve the results of ends of the worker's performance do not make the worker an employee."); *id.* ("[R]estrictions upon a worker's manner and means of performance that spring from government regulation . . . do not necessarily support a conclusion of employment status" because the company "is not controlling the driver," the law is.). As our "emphasis [shifts] to entrepreneurialism," *Corp. Express*, 292 F.3d at 780, these precedents apply *a fortiori*.

Likewise, "an incentive system designed 'to ensure that the drivers' overall performance meets the company standards' . . . is fully consistent with an independent contractor relationship." *C.C. Eastern*, 60 F.3d at 860 (quoting *NAVL*, 869 F.2d at 603). At the same time, a contractual willingness to share a small part of the risk—for instance, by providing fuel reimbursements when prices jump sharply, or by guaranteeing a certain minimum amount of income for making a vehicle available—does not an employee make. *See Argix Direct, Inc.*, 343 N.L.R.B. at 1019 (contractors were independent even though the "[e]mployer also pays the owner-operators a fuel surcharge when the price of fuel surpasses a preset average").

The Regional Director also emphasized that these "contractors perform a function that is a regular and essential part of FedEx Home's normal operations, the delivery of packages," and that few have seized any of the alleged entrepreneurial opportunities. *Representation Decision*, slip op. at 34, 38. While the essential nature of a worker's role is a legitimate consideration, it is not determinative in the face of more compelling countervailing factors, *see Aurora Packing v. NLRB,* 904 F.2d 73, 76 (D.C. Cir. 1990), otherwise companies like FedEx could never hire delivery drivers who *are* independent contractors, a consequence contrary to

precedent, *see St. Joseph News Press*, 345 N.L.R.B. at 479. And both the Board and this court have found the failure to take advantage of an opportunity is beside the point. *See C.C. Eastern*, 60 F.3d at 860 (opportunities cannot be ignored unless they are the sort workers "cannot realistically take," and even "one instance" of a driver using such an opportunity can be sufficient to "show[] there is no unwritten rule or invisible barrier preventing other drivers from likewise exercising their contractual right"); *Arizona Republic*, 349 N.L.R.B. at 1045. Instead, "it is the worker's retention of the right to engage in entrepreneurial activity rather than his regular exercise of that right that is most relevant for the purpose of determining whether he is an independent contractor." *C.C. Eastern*, 60 F.3d at 860.[8]

## III.

Our dissenting colleague reads our precedent differently than we do, and thus reaches a different conclusion. Of course the facts in our past holdings are not identical to those here, but there is no reason to distinguish this case from those where we have rejected the Board's attempt to assert jurisdiction over independent contractors. In fact, this case is relatively straightforward because not only do these contractors have the ability to hire others without FedEx's participation, only here do they own their routes—as in they can sell them, trade them, or just plain give them away. Moreover, if this court had shown as much deference to the Board as our colleague seems to suggest is its due, we wonder how *C.C. Eastern* and *NAVL* could possibly have been

---

[8] The Regional Director noted too that "FedEx Home offers what is essentially a take-it-or-leave-it agreement." But we will "draw no inference of employment status from merely the economic controls which many corporations are able to exercise over independent contractors with whom they contract." *NAVL*, 869 F.2d at 599.

decided the way that they were. Because the dispute turns on precedent, we recommend you read our cases—they are quite short—and see for yourself whether our friend's fight really is with us at all.

The dissent, for instance, argues that emphasizing entrepreneurialism has only truly begun with this case, and suggests we are doing so here for reasons apart from allegiance to precedent. *See, e.g.*, Dis. Op. at 11–12, 30. Lest any be confused, we again quote *Corporate Express*: "[W]e uphold as reasonable the Board's decision, at the urging of the General Counsel, to focus not upon the employer's control of the means and manner of the work but instead upon whether the putative independent contractors have a 'significant entrepreneurial opportunity for gain or loss.'" 292 F.3d at 780. We explicitly "agree[d] with the Board's suggestion that the latter factor better captures the distinction between an employee and an independent contractor," because, as reflected by the Restatement's comment, it is not "the degree of supervision under which [one] labors but . . . the degree to which [one] functions as an entrepreneur—that is, takes economic risk and has the corresponding opportunity to profit from working smarter, not just harder," that better illuminates one's status. *Id.* We retained the common law test (as is required by the Court's decision in *United Insurance*), but merely "shift[ed our] emphasis to entrepreneurialism," using this "emphasis" to evaluate common law factors such as whether the contractor "supplies his own equipment," *id. Corporate Express* is thus doctrinally consistent with *United Insurance* and the Restatement.

Likewise, though conceding ours is a "fair reading of [*Corporate Express*], which contains considerable language regarding entrepreneurial opportunity and the benefits of using such a test," the dissent nonetheless argues there is a

narrower way to understand that case such that it still focuses on the extent of control. Dis. Op. at 9. Put another way, *Corporate Express*—despite its seemingly unambiguous language—to him need not be read as evincing a shift towards entrepreneurialism at all. We cannot adopt that reading because the court affirmatively declined to determine the contractors' status under a "means and manner test." *Corp. Express*, 292 F.3d at 780 ("[W]e need not answer that question . . . ."). We take *Corporate Express* at its word.

But even if *Corporate Express* never happened, the result here is unchanged. While on some points *C.C. Eastern* and *NAVL* are distinguishable—for instance, in *C.C. Eastern* there were no appearance requirements for man or machine (though "the tractor must be suitable for the task at hand"), *see* 60 F.3d at 859, as in *NAVL*, 869 F.2d at 600—the overwhelming majority of factors favoring independent contractor status are the same, and, importantly, this case is particularly straightforward because only here can the contractors own and transfer the proprietary interest in their routes. Moreover, all contractors here own their vehicles, something that cannot be said in *NAVL*, where not even the *majority* did. *See id.* True, these drivers—who need not be, and not always are, the same persons as the contractors—must wear uniforms and the like, but a rule based on concern for customer service does not create an employee relationship. *See C.C. Eastern*, 60 F.3d at 859. And while in *C.C. Eastern* "we [were] able to find . . . only one instance of a driver" using an entrepreneurial opportunity, that lone "example show[ed] that there [was] no unwritten rule or invisible barrier preventing other drivers from likewise exercising their contractual right." *Id.* at 860. In this case, we need not and do not rely on just one example of the exercise of rights. Even on an incomplete record there are many such examples; routes have been sold for a profit; substitutes and helpers have been hired without FedEx's

involvement; one contractor has negotiated for higher rates; and contractors have incorporated. Under the fairest reading of our precedent, these *are* independent contractors.

## IV.

We have considered all the common law factors, and, on balance, are compelled to conclude they favor independent contractor status. The ability to operate multiple routes, hire additional drivers (including drivers who substitute for the contractor) and helpers, and to sell routes without permission, as well as the parties' intent expressed in the contract, augurs strongly in favor of independent contractor status. Because the indicia favoring a finding the contractors are employees are clearly outweighed by evidence of entrepreneurial opportunity, the Board cannot be said to have made a choice between two fairly conflicting views. Though evidence can be marshaled and debater's points scored on both sides, the evidence supporting independent contractor status is more compelling under our precedent. The evidence might have been stronger still had not the Regional Director erroneously excluded the national data. But even as the record stands, the Board's determination was legally erroneous.

Accordingly, we grant the petition, vacate the Board's order, and deny the cross-application for enforcement.

*So ordered.*

GARLAND, *Circuit Judge*, dissenting in part: In *National Labor Relations Board v. United Insurance Co. of America*, the Supreme Court held that Congress intended "the Board and the courts" to "apply the common-law agency test . . . in distinguishing an employee from an independent contractor" under the National Labor Relations Act (NLRA). 390 U.S. 254, 256 (1968). In this case, the National Labor Relations Board (NLRB) applied that multi-factor test and concluded that FedEx Home Delivery's drivers are the company's employees. My colleagues disagree, concluding that the drivers are independent contractors.

This is not merely a factual dispute. Underlying my colleagues' conclusion is their view that the common-law test has gradually evolved until one factor -- "whether the position presents the opportunities and risks inherent in entrepreneurialism" -- has become the focus of the test. Slip Op. at 7, 18. Moreover, in their view, this factor can be satisfied by showing a few examples, or even a single instance, of a driver seizing an entrepreneurial opportunity. *Id.* at 17.

Although I do not doubt my colleagues' sincerity, I detect no such evolution. To the contrary, the Board and the courts have continued to follow the Supreme Court's injunction that "there is no shorthand formula or magic phrase that can be applied to find the answer, but all of the incidents of the relationship must be assessed and weighed with no one factor being decisive." *United Ins.*, 390 U.S. at 258. The common-law test may well be "unwieldy," Slip Op. at 7, but a court of appeals may not "'displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*.'" *United Ins.*, 390 U.S. at 260 (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)). While the NLRB may have authority to alter the focus of the common-law test, *see Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43, 863-64 (1984), this court does not. Because "the least that can

be said for the Board's decision is that it made a choice between two fairly conflicting views, . . . the Court of Appeals should have enforced the Board's order." *United Ins.*, 390 U.S. at 260. Accordingly, on the existing record, I cannot join in condemning the Board's determination.

I can and do, however, fault the Board's refusal to give FedEx a fair opportunity to make its case under the appropriate test. As the court correctly notes, the Regional Director refused to permit FedEx to introduce evidence that may be relevant to the question of whether its drivers have significant entrepreneurial opportunities. Regardless of whether one considers entrepreneurial opportunity as only one factor (as it is in the common-law test) or as the focus of the test (as my colleagues believe it to be), FedEx surely had the right to introduce the evidence necessary to make its case.

I

A

The NLRA makes it "an unfair labor practice for an employer . . . to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). Section 2(3) of the Act, as amended by the 1947 Labor Management Relations Act, provides that the term "employee" "shall not include . . . any individual having the status of an independent contractor." 29 U.S.C. § 152(3). In *United Insurance*, the Supreme Court held that the "obvious purpose of this amendment was to have the Board and the courts apply general agency principles in distinguishing between employees and independent contractors under the Act. . . . Thus there is no doubt that we should apply the common-law agency test . . . in distinguishing an employee from an independent contractor."

*United Ins.*, 390 U.S. at 256.[1]  The Court recognized that "[t]here are innumerable situations which arise in the common law where it is difficult to say whether a particular individual is an employee or an independent contractor. . . . In such a situation as this there is no shorthand formula or magic phrase that can be applied to find the answer, but all of the incidents of the relationship must be assessed and weighed with no one factor being decisive.  What is important is that the total factual context is assessed in light of the pertinent common-law agency principles."  *Id.* at 258.

The cases under review in *United Insurance* presented the question of whether certain agents of an insurance company were employees or independent contractors.  The Supreme Court determined that

> the decisive factors in these cases become the following:  the agents . . . perform functions that are an essential part of the company's normal operations; they need not have any prior training or experience, but are trained by company supervisory personnel; they do business in the company's name with considerable assistance and guidance from the company and its managerial personnel and ordinarily sell only the company's policies; the "Agent's Commission Plan" that contains the terms and conditions under which they operate is promulgated and changed unilaterally by the

---

[1]*See also NLRB v. Town & Country Elec., Inc.*, 516 U.S. 85, 94 (1995) (noting that "[i]n the past, when Congress has used the term 'employee' without defining it, we have concluded that Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine" (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322-23 (1992) (quoting *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 739-40 (1989))))).

company; the agents account to the company for the funds they collect under an elaborate and regular reporting procedure; the agents receive the benefits of the company's vacation plan and group insurance and pension fund; and the agents have a permanent working arrangement with the company under which they may continue as long as their performance is satisfactory.

*Id.* at 258-59. The Court confirmed that the Board had "examined all of these facts and found that they showed the debit agents to be employees." *Id.* at 260. This finding, the Court said, "involved the application of law to facts -- what do the facts establish under the common law of agency: employee or independent contractor?" *Id.* Although the Court noted that such a determination "involved no special administrative expertise that a court does not possess," it nonetheless held that, "'even as to matters not requiring expertise,'" a court of appeals may not "'displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*.'" *Id.* (quoting *Universal Camera Corp.*, 340 U.S. at 488). As long as it "can be said for the Board's decision . . . that it made a choice between two fairly conflicting views, . . . the Court of Appeals should . . . enforce[] the Board's order. It [is] error to refuse to do so." *Id.*

In the succeeding decades, the NLRB has consistently "[a]ppl[ied] the common-law agency test as interpreted by the Supreme Court in *NLRB v. United Insurance Co.*" to determine whether a worker is an employee or an independent contractor. *Roadway Package Sys., Inc.* (*Roadway III*), 326 N.L.R.B. 842, 843 (1998); *id.* at 849 (declaring that the Supreme Court's "cases teach us not only that the common law of agency is the standard to measure employee status but also that we have no authority to

change it").[2]  In so doing, the Board has looked to the Restatement (Second) of Agency for the factors relevant to making that determination. *See, e.g.*, cases cited *supra* note 2. Those ten (nonexhaustive) factors are set out in the margin.[3] Following the injunction of the Supreme Court, the Board has

---

[2]*Accord Ariz. Republic*, 349 N.L.R.B. 1040, 1042 (2007); *St. Joseph News-Press*, 345 N.L.R.B. 474, 477-78 (2005); *Argix Direct, Inc.*, 343 N.L.R.B. 1017, 1020 & n.13 (2004).

[3]The Restatement provides:

In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:

(a) the extent of control which, by the agreement, the master may exercise over the details of the work;
(b) whether or not the one employed is engaged in a distinct occupation or business;
(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
(d) the skill required in the particular occupation;
(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
(f) the length of time for which the person is employed;
(g) the method of payment, whether by the time or by the job;
(h) whether or not the work is a part of the regular business of the employer;
(i) whether or not the parties believe they are creating the relation of master and servant; and
(j) whether the principal is or is not in business.

RESTATEMENT (SECOND) OF AGENCY § 220(2).

continued to reaffirm that "'all of the incidents of the relationship must be assessed and weighed with no one factor being decisive.'" *Roadway III*, 326 N.L.R.B. at 850 (quoting *United Ins.*, 390 U.S. at 258); *see, e.g.*, *Ariz. Republic*, 349 N.L.R.B. at 1042-46; *St. Joseph News-Press*, 345 N.L.R.B. at 477-78.

This Circuit has likewise recognized that "Congress intended that traditional agency law principles guide the determination whether workers are employees . . . or independent contractors," *N. Am. Van Lines, Inc. v. NLRB* (*NAVL*), 869 F.2d 596, 598 (D.C. Cir. 1989), and has looked to the Restatement factors for those principles, *id*. at 599-600. *See Local 777, Democratic Union Org. Comm. v. NLRB* (*Local 777*), 603 F.2d 862, 872-73 (D.C. Cir. 1978); *cf. Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-52 (1989) (citing both *United Insurance* and the Restatement's "nonexhaustive list of factors relevant to determining whether a hired party is an employee" in construing the meaning of the term "employee" under the Copyright Act of 1976). "[T]he ultimate determination," we have said, "requires a broad examination of all facets of the relationship between [the] company and" the worker. *NAVL*, 869 F.2d at 604 (citing *United Ins.*, 390 U.S. at 258); *see C.C. Eastern, Inc. v. NLRB*, 60 F.3d 855, 858 (D.C. Cir. 1995). As we further noted in *NAVL*, "[i]n applying traditional agency law principles, the NLRB and the courts have adopted a right-to-control test." 869 F.2d at 599. That "test requires an evaluation of all the circumstances," but it focuses the greatest attention on those factors indicating "'the extent of the actual *supervision* exercised by a putative employer over the "means and manner" of the workers' performance.'" *Id.*

(quoting *Local 777*, 603 F.2d at 873); *see C.C. Eastern*, 60 F.3d at 858 (same).[4]

B

My colleagues contend that "[g]radually," both this Court and the Board shifted away from "the unwieldy control inquiry in favor of a more accurate proxy: whether the 'putative independent contractors have significant entrepreneurial opportunity for gain or loss.'" Slip Op. at 6-7 (quoting *Corporate Express Delivery Sys. v. NLRB*, 292 F.3d 777, 780 (D.C. Cir. 2002)). "[W]hile all the considerations at common law remain in play," my colleagues maintain that now the "emphasis" is on "whether the position presents the opportunities and risks inherent in entrepreneurialism." *Id.* at 7.

The cases, however, do not evidence this gradual evolution to a test that emphasizes entrepreneurial opportunity. According to my colleagues, the evolutionary process began "implicit[ly]" in our decisions in *NAVL* and *C.C. Eastern*. Slip Op. at 7. It is true that those decisions listed entrepreneurial opportunity as a relevant factor, notwithstanding that it is not expressly mentioned in either *United Insurance* or the Restatement (or in

---

[4] *See also Seattle Opera v. NLRB*, 292 F.3d 757, 765 & n.11 (D.C. Cir. 2002) (applying the "common law definition" and concluding that auxiliary choristers are employees because "the Opera possesses the right to control [them] in the material details of their performance"); *Constr., Bldg. Material, Ice & Coal Drivers v. NLRB*, 899 F.2d 1238, 1242 (D.C. Cir. 1990) (noting that "[t]he right to control the 'means and manner' of job performance . . . is the *leitmotiv* recurrent in the cases" that consider whether construction truck drivers are employees or independent contractors).

any comment to the Restatement[5]).  But those decisions explicitly stated that entrepreneurial opportunity was only one of multiple factors to consider -- and not the most important one.

In *C.C. Eastern*, for example, we concluded that the entrepreneurial opportunities afforded by a driver's "right to hire . . . his own employees to help him" and to "use his tractor himself to haul for anyone" had "some probative weight," but that they were "*less important* to our determination of the drivers' status than [wa]s the absence of evidence that the Company supervises the means and manner of their work."  60 F.3d at 859, 860 (emphasis added).[6]  Similarly, we said in *NAVL* that:  "Other factors [than control] weigh in the determination," including "the extent to which the worker has assumed entrepreneurial risk and stands to gain from risks undertaken . . . .  However, *these factors are of far less importance* than the central inquiry whether the corporation exercises control over the manner and means of the details of the worker's performance; indeed, these factors are probative only to the extent that they bear upon and further that inquiry."  869 F.2d at 599-600 (emphasis added).  Nothing in these unambiguous declarations suggests any kind of "struggle[] to articulate exactly what we meant" in those cases.  Slip Op. at 6.  The contention that *C.C.*

---

[5]Restatement comment (d), to which my colleagues refer, states only that a "full-time cook is regarded as a servant" -- and *not* an independent contractor -- "although it is understood that the employer will exercise no control over the cooking."  Restatement (Second) of Agency § 220(1) cmt. d.  The comment does not mention entrepreneurial opportunity, which plays no role in its analysis of the cook's status.

[6]*See also C.C. Eastern*, 60 F.3d at 858 ("Whether a worker is an independent contractor or an employee is a function of the amount of control that the company has over the way in which the worker performs his job.").

*Eastern* and *NAVL* implicitly signaled the advent of an evolutionary process, *id.* at 6-7, is simply incorrect.

My colleagues cite only one case from this (or any) Circuit, our 2002 opinion in *Corporate Express*, for the proposition that entrepreneurial opportunity has "explicit[ly]" become the emphasis of the independent contractor test. Slip Op. at 7. I do not dispute that theirs is one fair reading of that opinion, which contains considerable language regarding entrepreneurial opportunity and the benefits of using such a test. But *Corporate Express* did not purport to overrule Supreme Court, Circuit, and Board precedent. Indeed, in affirming as reasonable the *Board's* determination that the owner-operator drivers in that case were *not* independent contractors, the court not only agreed that they lacked entrepreneurial opportunity, but also acknowledged that the Board may have correctly determined that the employer controlled the way in which they performed their jobs. *Corporate Express*, 292 F.3d at 779-80. Hence, *Corporate Express* can also be read as merely holding that the Board was reasonable in determining that entrepreneurial opportunity tipped the balance in *that* case -- a logical result given that the court thought the vector of the other common-law factors somewhat unclear, *see id.* at 780 & n.*, while finding that the "owner-operators lacked *all* entrepreneurial opportunity," *id.* at 780-81 (emphasis added). And when there are two possible readings of an opinion, only one of which is consistent with earlier precedent, the appropriate course is to adopt the consistent reading -- on the presumption that the court followed the command of *stare decisis*. *Cf. Indep. Cmty. Bankers of Am. v. Bd. of Governors of the Fed. Reserve Sys.*, 195 F.3d 28, 34 (D.C. Cir. 1999) ("In the event of conflicting panel opinions . . . the

earlier one controls, as one panel of this court may not overrule another." (internal quotation marks and citation omitted)).[7]

There was certainly nothing in the NLRB's opinion in *Corporate Express* to suggest that entrepreneurial opportunity had become the focus of the Board's own analysis. To the contrary, the Board simply followed its traditional approach of examining the common-law factors -- including, inter alia, both entrepreneurial opportunity and employer control. *Corporate Express Delivery Sys.*, 332 N.L.R.B. 1522, 1522 (2000). After doing so, it concluded that, "*weighing all of the incidents of their relationship* with the Respondent, we find that the owner-operators are employees and not independent contractors." *Id.* (emphasis added).

My colleagues maintain that the evolution toward an emphasis on entrepreneurial opportunity "seems to play a part in the Board's own cases," although they "readily concede the Board's language has not been . . . unambiguous." Slip Op. at 8. The principal NLRB decision upon which they rely is *Arizona Republic*, a decision issued *after* the Regional Director's decision in this case. *Ariz. Republic*, 349 N.L.R.B. 1040 (May 8, 2007). But *Arizona Republic* does not support my colleagues' proposition either. Once again, it is true that *one* of the factors weighing in favor of the independent contractor determination in that case was "entrepreneurial potential." *Id*. at 1042. There simply is no indication, however, that this factor was the

---

[7]I do not suggest that *Corporate Express* should be read as "focus[ing] on the extent of control," Slip Op. at 19, but rather that it should not be read as giving primacy to entrepreneurial opportunity. Moreover, to the extent that there has been a shift of emphasis in the Board's own cases, it has been toward regarding *no* single factor as primary -- whether it be opportunity or control. *See St. Joseph News-Press*, 345 N.L.R.B. at 478; *Roadway III*, 326 N.L.R.B. at 850.

"emphasis" of the test *Arizona Republic* applied. To the contrary, the Board announced that, "[i]n determining the status of the [newspaper] carriers in this case, we rely on . . . the common-law factors." *Id.* at 1043. It then proceeded to examine the Restatement factors individually, *id.* at 1043-46, repeating its oft-stated mantra that "this list of factors is not exclusive or exhaustive, and that, in applying the common-law agency test, [we] will consider '*all* the incidents of the individual's relationship to the employing entity,'" *id.* at 1042 (quoting *Roadway III*, 326 N.L.R.B. at 850). The Board ultimately concluded that the majority of the factors "weigh[ed] in favor" of finding that the carriers were independent contractors. *Id.* at 1043-46. One of those factors was entrepreneurial opportunity; another was the employer's lack of control over the carriers. *Id.* But the Board gave pride of place to neither one, declaring only that the common-law factors, "on balance," yielded the conclusion that the carriers were independent contractors. *Id.* at 1043. The same traditional common-law analysis was employed in both of the other NLRB decisions that my colleagues cite. Slip Op. at 9.[8]

Finally, I do not dispute my colleagues' contention that the multi-factor analysis of the common law is "not especially amenable to any sort of bright-line rule." Slip Op. at 4-5. Although they acknowledge that an emphasis on entrepreneurial

---

[8] *See St. Joseph News-Press*, 345 N.L.R.B. at 478 (noting that "the Board's analysis . . . [has] recognized, as does Supreme Court law, that both the right of control and other factors, as set out in the Restatement, are to be used to evaluate claims that hired individuals are independent contractors"); *Dial-A-Mattress Operating Corp.*, 326 N.L.R.B. 884, 891 (1998) (declaring that "the list of factors differentiating 'employee' from 'independent contractor' status under the common-law agency test is nonexhaustive, with no one factor being decisive").

opportunity "does not make applying the test purely mechanical," they maintain that "the line drawing is easier" under that test. *Id.* at 8. There is no question that the common-law agency test makes for difficult line drawing. Indeed, the Supreme Court expressly acknowledged as much when it announced the test. *See United Ins.*, 390 U.S. at 258 ("There are innumerable situations which arise in the common law where it is difficult to say whether a particular individual is an employee or an independent contractor . . . ."). It may also be true that line drawing under an entrepreneurial opportunity test would be easier, although that is hardly assured. After all, while my colleagues perceive clear entrepreneurial opportunity in this case, neither the Board nor I see it that way. *See infra* Part II.

But the comparative practical advantage of one or the other of these two tests has no bearing on which one we must apply. Although the NLRB may have authority to alter the test, or at least to alter its focus, *see Chevron*, 467 U.S. at 842-43, 863-64, this court does not. Until the Supreme Court or the Board tells us differently, we must continue to apply the multi-factor common-law test as set forth by the Supreme Court and applied by the Board.

## II

In this case, the NLRB's Regional Director applied the traditional "common law agency test." *FedEx Home Delivery and Local 25*, N.L.R.B. Case Nos. 1-RC-22034, 22035, slip op. at 33 (First Region, Sept. 20, 2006) [hereinafter Regional Director's Decision]. In so doing, she "consider[ed] all the incidents of the individual's relationship with the employing entity," *id.*, including both the extent of FedEx's control over the drivers and the extent of the drivers' entrepreneurial opportunities, *id.* at 35-36. Although the Regional Director acknowledged many of the facts cited by my colleagues in

support of FedEx's contention that the contractors are independent contractors, facts that I do not rehearse here, she concluded that they were outweighed by other factors supporting employee status. *Id.* at 39. Part II.A reviews the bulk of the factors that the Director found to support employee status. Part II.B discusses her analysis of the issue of entrepreneurial opportunity.

A

In a lengthy and considered opinion, the Regional Director found the following facts to favor a determination that FedEx Home Delivery's drivers, whom the company calls "contractors," were employees:

> [A]ll the FedEx Home contractors perform a function that is a regular and essential part of FedEx Home's normal operations, the delivery of packages. . . . [A]ll contractors must do business in the name of FedEx Home[,] . . . wear[] FedEx Home-approved uniforms and badges, . . . [and] operate vehicles that must meet FedEx Home specifications and uniformly display the FedEx Home name, logo, and colors. . . . No prior delivery training or experience is required, and FedEx Home will train those with no experience. . . .
>
> . . . [C]ontractors are not permitted to use their vehicles for other purposes while providing service for FedEx Home. The contractors have a contractual right to use their FedEx Home trucks in business activity outside their relationship with FedEx Home during off-hours, provided they remove all FedEx Home markings, but only one former multiple route contractor . . . and no current contractors at either Wilmington terminal have ever done so. . . .

. . . FedEx Home exercises substantial control over all the contractors' performance of their functions. FedEx Home offers what is essentially a take-it-or-leave-it agreement. . . . [It] retains the right to reconfigure the service area unilaterally. All contractors must furnish a FedEx Home-approved vehicle and FedEx Home-approved driver daily from Tuesday through Saturday; they do not have discretion not to provide delivery service on a given day. While all contractors control their starting times and take breaks when they wish, their control over their work schedule is circumscribed by the requirement that all packages be delivered on the day of assignment. . . .

. . . FedEx Home provides support to all its contractors in various ways that are inconsistent with independent contractor status. . . . FedEx Home provides extensive support to contractors by offering the Business Support Package and arranging for the required insurance, thus providing an array of required goods and services that would be far more difficult for contractors to arrange on their own. . . . FedEx Home also offers to arrange for approved substitute drivers for its contractors by virtue of the Time Off Program. FedEx Home provides contractors who maintain sufficient vehicle maintenance accounts with $100 per accounting period to help defray repair costs[, and] requires contractors to permit FedEx Home to pay certain vehicle-related taxes and fees on their behalf and to have the payments deducted from their settlement.

Regional Director's Decision at 34-37 (internal citations omitted). Many of these are the kind of facts that *United*

*Insurance*, the Restatement, and numerous Circuit and Board decisions confirm are indicative of employee status.[9]

My colleagues nonetheless reject the import of many of these facts, arguing that they merely "reflect differences in the type of service the contractors are providing rather than differences in the employment relationship." Slip Op. at 14. In particular, the court rejects the import of the following requirements imposed by FedEx: that drivers wear a recognizable uniform; that vehicles be of a particular color and size range; that trucks display the FedEx logo in a size larger than Department of Transportation regulations require; that drivers complete a driving course if they do not have prior training; that drivers submit to two customer service rides per year to audit their performance; and that a truck and driver be available for deliveries every Tuesday through Saturday. *Id.* The courts and the Board,[10] however, have repeatedly regarded the presence or absence of these very factors as important in

---

[9]*See, e.g.*, *United Ins.*, 390 U.S. at 256-58; *NAVL*, 869 F.2d at 600-04; *Local 777*, 603 F.2d at 873-81; *Argix Direct*, 343 N.L.R.B. at 1017-20; *Roadway III*, 326 N.L.R.B. at 843-48, 851-54; RESTATEMENT (SECOND) OF AGENCY § 220(2) (1958).

[10]It is to the precedents of the Board, and not to those of the Internal Revenue Service, that we owe deference, as only the former is charged with enforcing the provisions of the NLRA. *Compare* Slip Op. at 15 (citing an IRS guideline to support the proposition that a uniform requirement does not reflect employer control), *with, e.g.*, *Roadway III*, 326 N.L.R.B. at 851-52 (citing the employer's requirement that its drivers wear an "approved uniform" as evidence that they are employees).

determining whether a worker is an employee or independent contractor.[11]

One factor that the Regional Director emphasized was that the drivers "perform a function that is a regular and essential part of FedEx Home's normal operations, the delivery of packages" to homes. Slip Op. at 16. Although my colleagues acknowledge that "the essential nature of a worker's role is a legitimate consideration," they minimize it as "not determinative." *Id.* But that is true of every factor in the common-law test. *See United Ins.*, 390 U.S. at 258 (holding that "all of the incidents of the relationship must be assessed and weighed with no one factor being decisive"). Moreover, the cases have repeatedly cited this

---

[11]*See, e.g.*, *United Ins.*, 390 U.S. at 258-59 (listing, among other "decisive factors" of employee status, the fact that the insurance agents "need not have any prior training or experience, but are trained by company supervisory personnel," and that "they do business in the company's name"); *C.C. Eastern*, 60 F.3d at 858 (finding the following facts, among many others, to be indicative of an independent contractor relationship: the employer does not "exercise any control over the drivers' dress or appearance" or "require the tractors to be of any specific type, size, or color"); *NAVL*, 869 F.2d at 600 (citing, among other "principal reasons" why the drivers are independent contractors, the fact that they "retain nearly absolute control" over "their dress" and "when they work"); *Corporate Express Delivery Sys.*, 332 N.L.R.B. at 1522 (finding that owner-operator drivers are employees because, inter alia, "[t]hey are required to display the Respondent's logo on their vehicles and to wear certain color trousers, shirts, and shoes, if they opt not to wear uniforms"); *Roadway III*, 326 N.L.R.B. at 851-52 (citing, among other factors in concluding that drivers are employees, the facts that: "they need not have any prior training or experience, but receive training from the company; they do business in the company's name"; they wear an "approved uniform"; and there is a "'business support package' [that] helps ensure that the drivers' vehicles are properly maintained").

particular factor in concluding that workers are employees.[12]  In short, there is no basis for discounting the significance of the traditional factors upon which the Regional Director relied in concluding that the FedEx drivers are employees rather than independent contractors.

B

In accord with court and agency precedent, the Regional Director also considered whether FedEx Home Delivery's drivers have significant entrepreneurial opportunity for gain or loss.  For the following reasons, she concluded that the evidence of entrepreneurial opportunity was weak:

> The contractors' compensation package also supports employee status.  With [one] exception . . . , FedEx Home unilaterally establishes the rates of compensation for all contractors. . . .  [T]here is little room for the contractors to influence their income through their own efforts or ingenuity, as their terminal manager determines, for the most part, how many deliveries they will make each day. . . .  A contractor's territory may be unilaterally reconfigured by FedEx Home.  FedEx Home tries to insulate its contractors from loss to some

---

[12]*See, e.g.*, *United Ins.*, 390 U.S. at 258-59 (holding that the fact that the insurance agents "perform functions that are an essential part of the company's normal operations" is a "decisive factor[]"); *Aurora Packing Co. v. NLRB*, 904 F.2d 73, 76 (D.C. Cir. 1990) (noting that "whether a worker plays an essential role in a company's business" is a factor "presumably because the company more likely than not would want to exercise control over such important personnel"); *Roadway III*, 326 N.L.R.B. at 851 (citing as a factor that the drivers "perform[] essential functions that allow Roadway to compete in the small package delivery market"); *see also* RESTATEMENT (SECOND) OF AGENCY § 220(2)(h).

degree by means of the vehicle availability payment, which they receive just for showing up, and the temporary core zone density payment, both of which payments guarantee contractors an income level predetermined by FedEx Home, irrespective of the contractors' personal initiative. FedEx Home also shields drivers from loss due to substantial increases in fuel prices by means of the fuel/mileage settlement.

Regional Director's Decision at 37.

Notwithstanding these findings, my colleagues perceive many "characteristics of entrepreneurial potential" in the drivers' relationship to FedEx. Slip Op. at 9. Some of the characteristics they cite, however, appear to have little to do with entrepreneurial opportunity. For example, the court's opinion notes that FedEx's Standard Contractor Operating Agreement "specifies the contractor is not an employee of FedEx for any purpose." *Id.* at 10. But the label FedEx puts on its relationship with its workers does not affect whether they have entrepreneurial opportunity for gain or loss.[13]

---

[13]*See Corporate Express*, 292 F.3d at 780 n.* (affirming the Board's determination that, although drivers "were described in their contract as 'independent contractors,'" they were actually employees). Nor is there much significance to the fact that FedEx does not "withhold taxes." Slip. Op. at 9 n.4. *See Seattle Opera*, 292 F.3d at 764 n.8 (noting that "'if an employer could confer independent contractor [i.e., non-employee] status through the absence of payroll deductions there would be few employees falling under the protection of the Act'" (quoting *J. Huizinga Cartage Co. v. NLRB*, 941 F.2d 616, 620 (7th Cir. 1991)). *Compare also* Slip Op. at 9 n.4 (noting that FedEx "does not provide benefits"), *with Corporate Express*, 292 F.3d at 780 n.* (finding that drivers were not independent contractors notwithstanding that they "received no life or health insurance" benefits from the company).

My colleagues also observe that FedEx "may not prescribe hours of work [or] whether or when the contractors take breaks," and that the drivers "are not subject to reprimands or other discipline," Slip Op. at 10 -- all of which go not to the workers' entrepreneurial opportunity but to the extent of the employer's control, a factor discussed in Part II.A above.  In any event, although FedEx does not fix specific hours or break times, it does require its contractors to provide delivery services every day, Tuesday through Saturday, and to finish each day's deliveries by the end of the day.  Regional Director's Decision at 17, 36.[14]  The insurance agents in *United Insurance* had neither fixed hours nor fixed break times, yet the Supreme Court affirmed the Board's determination that they were employees.  *See* 390 U.S. at 258 (noting that the "agents perform their work primarily away from the company's offices and fix their own hours of work and work days").  And while FedEx does not have a disciplinary system based on "reprimands," Slip Op. at 10, it does deny drivers bonuses if they fail release audits and uses both counseling and termination as tools to ensure compliance with work rules.  Regional Director's Decision at 12, 21. Again, the same was true in *United Insurance*.  *See* 390 U.S. at 258 (noting that if a complaint against an agent is "well founded, the manager talks with the agent to set him straight," "caution[s]" him, and  "[i]f improvement does not follow," the company may "fire [him] at any time").

---

[14]The Regional Director also noted that a driver cannot take a vacation, or even a day off, when he wants to, without providing a replacement.  *See* Regional Director's Decision at 26; *id.* at 40 (distinguishing other cases in part on the basis that drivers for those companies were "not required to provide delivery services each day" and "were free to elect not to accept routes on specific days").  Even those who participate in FedEx's Time Off Program must schedule vacations in advance, and weeks are assigned by seniority.  *Id.* at 25-26.

In addition, my colleagues state that "[a]t least one contractor has negotiated with FedEx for higher fees." Slip Op. at 10. Without agreeing that a worker's ability to negotiate his salary takes him out of the category of "employee," the Regional Director rightly regarded the only evidence on this point as quite weak: One former manager testified that one former driver "once requested some customer service rides to gauge if his core zone payment was set properly, and the payment was raised as a result, although [the manager] was not sure by how much. There is no evidence that any other contractors at the Wilmington facilities have negotiated a change in their core zone payment." Regional Director's Decision at 20.

Closer to the mark on the issue of entrepreneurial opportunity is the court's observation that drivers "are responsible for all the costs associated with operating and maintaining their vehicles." Slip Op. at 10.[15] But FedEx does much to limit the drivers' risk of loss. As the Regional Director found, the company "shields drivers from loss due to substantial increases in fuel prices by means of the fuel/mileage settlement" and guarantees them a significant amount of income "just for showing up." Regional Director's Decision at 37. My colleagues maintain that this "contractual willingness to share a small part of the risk . . . does not an employee make." Slip Op. at 16. The NLRB reasonably differs, as to both the magnitude of the shared risk and its import.

My colleagues further note that, under the Operator Agreement, drivers "may use the vehicles for other commercial or personal purposes" when they are not in the service of FedEx,

---

[15]My colleagues also note that "all contractors here own their vehicles." Slip Op. at 19. The same was true in *Corporate Express*, but we nonetheless found that those drivers had "no real entrepreneurial opportunities." 292 F.3d at 780 n.*.

"so long as they remove or mask all FedEx Home logos and markings." Slip Op. at 10. But do the drivers actually use their trucks for other purposes? Not so much. Indeed, the most that can be said is that "some do use them for personal uses like moving family members," *id*., hardly an indicator of a "'significant entrepreneurial opportunity for gain or loss,'" *id.* at 7 (quoting *Corporate Express*, 292 F.3d at 780). Although the drivers' use of their trucks to conduct business independent of FedEx could well be an indicator of entrepreneurialism, the Regional Director found that "no current contractors at either Wilmington terminal have ever done so." Regional Director's Decision at 35.[16] Nor would they have much time, even if they wanted to. The Operator Agreement states that the company "seek[s] to manage its business so that it can provide sufficient volume of packages to Contractor *to make full use* of Contractor's equipment." FedEx Home Delivery Standard Contractor Operating Agreement, Private Background Statement (J.A. 720) (emphasis added). The contractor must provide daily service,[17] and "[w]hile the Equipment is in the service of [FedEx], it shall be used by Contractor exclusively for the carriage of the goods of [FedEx], and for no other purpose." *Id.* § 1.4 (J.A. 722).

---

[16]A former manager testified that one former driver, Alan Douglass, used his truck to deliver lawn mowers for a repair company. Regional Director's Decision at 15.

[17]It is true that a driver could take on extra work on his weekends (although none do). But *C.C. Eastern* did not hold that this would make him an independent contractor, Slip Op. at 10 n.5 -- no more than taking on a second, weekend job would turn any full-time employee into an "entrepreneur."

Based on these facts, the Regional Director found that the

> "lack of pursuit of outside business activity appears to be less a reflection of entrepreneurial choice by the . . . drivers and more a matter of the obstacles created by their relationship with [the Company.]" Thus, the contractors' contractual right to engage in outside business falls within the category of "entrepreneurial opportunities that they cannot realistically take," because the contractors' work schedules prevent them from taking on additional business during their off-hours during the workweek.

Regional Director's Decision at 35 (quoting *Roadway III*, 326 N.L.R.B. at 851 & n.36). That is at least a fair conclusion, and consequently one that we may not displace. *See United Ins.*, 390 U.S. at 260.

Another indicator of entrepreneurialism to which my colleagues point is the fact that operators may hire drivers as temporary replacements and occasional helpers. I agree that the "ability to hire 'others to do the Company's work' is no small thing in evaluating 'entrepreneurial opportunity.'" Slip Op. at 12 (quoting *Corporate Express*, 292 F.3d at 780-81). *But see Roadway III*, 326 N.L.R.B. at 845 (finding that drivers are employees notwithstanding that, "without prior approval from Roadway, [they] may also use helpers or replacement drivers on their routes"). Once again, however, the record evidence on this issue was weak. The Regional Director found that "many contractors who hire substitute drivers use the FedEx Home 'temp' drivers," Regional Director's Decision at 29, and that the record did not reveal how often contractors hired outside helpers, *id.* at 30. Nor was there any evidence that any operator at the terminals at issue in this case ever hired a substitute on a full-time basis.

My colleagues also note the fact that FedEx drivers "may contract to serve multiple routes," and that if they do so, they may hire other drivers to handle those routes. Slip Op. at 11. Although this, too, may indicate entrepreneurial opportunity, there were only 3 multiple-route drivers operating out of the Wilmington facilities. Regional Director's Decision at 28. This is as compared to a case like *Arizona Republic*, in which the Board determined that newspaper carriers were independent contractors after finding that 363 of them had multiple routes. *Ariz. Republic*, 349 N.L.R.B. at 1045 n.6. Moreover, the Regional Director excluded multiple-route drivers from the bargaining unit on the ground that they were not employees but rather statutory supervisors. Regional Director's Decision at 42-43.

My colleagues find particularly significant the fact that drivers have a contractual right to sell their routes, and that this could provide an opportunity for profit. That theoretical possibility, however, is tightly constrained. The drivers may sell only to those buyers whom FedEx accepts as qualified; the company gives out routes without charge,[18] as it did at the two Wilmington terminals; and FedEx can reconfigure a route, "in its sole discretion," at any time. Regional Director's Decision at 16 (referencing the FedEx Operating Agreement); *see id.* at 38. These facts cannot help but limit (or eliminate) any opportunity for profit. *See id.* at 60 n.73.

---

[18]There is nothing confused about saying that FedEx gives out routes without charge when it does not charge anything for routes. *See* Slip Op. at 13. Of course the driver agrees to provide delivery service on the route, and of course FedEx pays compensation for that service. *Id.* But the fact that FedEx will give a new driver a route without charging for it, and can reconfigure any route that a driver purchases from a former driver, plainly constrains the value of the latter.

In light of these constraints, it is not surprising that, although there was evidence that drivers abandoned their routes without selling them, *id.* at 32, there was little evidence that any driver had ever materially profited from a sale: "[T]here is no evidence that any Ballardvale contractor has ever sold a route," and there is evidence of only one single-route sale at Jewel Drive. *Id.* at 31, 38.[19] The only evidence of profit on that sale was the uncorroborated testimony of the former operator that he sold the route and truck together for at least $3000 more than the truck's market value, minus $1000 he paid to the broker. *Id.* at 31-32. As the Regional Director noted, the fact that the sale was "combined with the sale of a truck . . . makes the portion attributable to the route murky." *Id.* at 38. Based on the operator's statement alone, he may have netted no more than $2000 -- without factoring in his expenses over the two years he had the truck and route. More important, the evidence that there was any gain at all was "murky" indeed. As the Regional Director pointed out, although the operator claimed that he had a bill of sale to support his testimony, and told the hearing officer that he would produce it, he never did. *Id.* at 57 n.59. Given that the burden is on the proponent of independent contractor status

---

[19]The only other sale was by a multiple-route driver. The driver, Timothy Jung, received about $36,000 for his truck -- for which he had paid about $35,000 -- together with one of his routes. Jung abandoned his second route without receiving anything for it. Regional Director's Decision at 32, 38. "In these circumstances," the Regional Director reasonably found "the evidence of only two route sales too insubstantial to support a finding of independent contractor status." *Id.* at 38-39.

25

to prove its case,[20] it was not unreasonable for the Director to conclude that FedEx had failed to do so.

C

It would be a mistake, however, to read the court's opinion as reflecting nothing more than a factual disagreement with the NLRB, even on the question of whether the drivers had entrepreneurial opportunity. There is something more important at stake here. In concluding that the indicia of entrepreneurial opportunity were weak, the Regional Director emphasized that few operators seized any of the opportunities that allegedly were available to them. Accordingly, she adhered to the NLRB's precedent in *Roadway III*, which involved FedEx Home's predecessor corporation, wherein the "Board found that evidence of a few . . . sales . . . [was] insufficient to support a finding of independent contractor status, particularly since it was unclear from the record whether any driver had profited materially from a sale." Regional Director's Decision at 38 (citing 326 N.L.R.B. at 853).

My colleagues, by contrast, maintain that the failure to actually exercise theoretical opportunities is "beside the point" because "'it is the worker's retention of the right to engage in entrepreneurial activity rather than his regular exercise of that right that is most relevant.'" Slip Op. at 17 (quoting *C.C. Eastern*, 60 F.3d at 860). But the proper emphasis in that quotation from our *C.C. Eastern* opinion is on the word

---

[20]*See Argix Direct*, 343 N.L.R.B. at 1020; *BKN, Inc.*, 333 N.L.R.B. 143, 144 (2001); *Cent. Transport, Inc.*, 247 N.L.R.B. 1482, 1483 n.1 (1980); *see also NLRB v. Ky. River Cmty. Care, Inc.*, 532 U.S. 706, 710-12 (2001) (affirming the Board's rule that the burden of proof is on the party claiming that a worker is a supervisor rather than an employee).

"regular." It may not be necessary for workers to *regularly* exercise their right to engage in entrepreneurial activity for that factor to weigh in the balance, but "if a company offers its workers entrepreneurial opportunities that they cannot realistically take, then that does not add any weight to the Company's claim that the workers are independent contractors." *C.C. Eastern*, 60 F.3d at 860.

Quoting *C.C. Eastern* and citing *Arizona Republic*, my colleagues suggest that "even 'one instance' of a driver using such an opportunity can be sufficient to 'show[] there is no unwritten rule or invisible barrier preventing other drivers from likewise exercising their contractual right.'" Slip Op. at 17. But all *C.C. Eastern* held was that under those circumstances, the Board had erred in "discount[ing] to zero" the significance of that single factor in the traditional multi-factor test. *C.C. Eastern*, 60 F.3d at 860. Nor is there anything in *Arizona Republic* to suggest that the Board believes that the exercise of contractual opportunity by one or even a small number of drivers can be sufficient. In that case, "[m]any carriers h[e]ld other jobs," "40 percent of the carriers actually solicited new subscriptions," and 363 carriers -- roughly 29 percent of all carriers -- had multiple routes. 349 N.L.R.B. at 1045; *id.* at 1045 n.6. It was in this context, in which "many" carriers held other jobs, solicited business, and had multiple routes -- and hence had proven opportunity -- that the Board said "the fact that many [other] carriers choose not to take advantage of this opportunity to increase their income does not mean that they do not have the entrepreneurial *potential* to do so." *Id.* at 1045; *compare* Slip Op. at 9. In the instant case, by contrast, no FedEx driver has another job or solicits business from his delivery customers,[21]

---

[21]The closest FedEx comes to contending that any driver has solicited business -- and it is not very close -- is its contention that one driver "asked the retailer L.L. Bean to ship him some catalogs to

and only three have multiple routes. Regional Director's Decision at 7, 28.

The import of my colleagues' suggestion that one or even a few examples of the exercise of contractual rights can be enough to decide the entrepreneurialism factor is magnified by their view that this factor is not just one element in a multi-factor test, but rather the test's "emphasis" -- so that an insubstantial exercise may, in effect, tilt the entire outcome.[22]  That was certainly not the role that entrepreneurialism played in *C.C. Eastern*, in which we held that, although indicia of entrepreneurial opportunity did "have some probative weight," they were "less important to our determination of the drivers' status than . . . the absence of evidence that the Company supervises the means and manner of their work."  60 F.3d at 859; *see id.* at 860.  Nor has it played that role in any other case.

It is not unreasonable for the NLRB to take the position that a material number of workers must actually take advantage of an opportunity before it will conclude that the opportunity is significant and realistic rather than insubstantial and theoretical. *See* Regional Director's Decision at 39.  Even if that is not the better rule, "the least that can be said for the Board's decision is that it made a choice between two fairly conflicting views, and

distribute to his customers to generate more L.L. Bean deliveries." Regional Director's Decision at 53 n.33.

[22]The significance of designating entrepreneurialism as the emphasis of the test is not diminished by saying that it is a "principle by which to evaluate [the other common-law factors] in cases where some factors cut one way and some the other." Slip Op. at 7.  This is particularly true because the opinion elevates no other principle to that role.  Cases in which factors cut in different directions are the only cases at issue, as no determinative principle is required when all the factors point in the same direction.

under these circumstances the Court of Appeals should have enforced the Board's order." *United Ins.*, 390 U.S. at 260.

III

But there is a rub.  Perhaps recognizing the thinness of the record, FedEx attempted to improve its proof of entrepreneurial opportunity by proffering "system-wide evidence concerning the number of route sales and the amount of profit, if any, on any such sale."  Order, *FedEx Home Delivery*, N.L.R.B. Case Nos. 1-RC-22034, 22035 (Nov. 8, 2006) (Battista, Chrmn., dissenting).  The Regional Director, however, "refus[ed] to permit the Employer to introduce" this evidence.  *Id.*  In light of that refusal, the Chairman of the NLRB dissented from the denial of Board review, protesting that this "evidence may be relevant to the issue of whether the drivers have an entrepreneurial interest in their position."  *Id.*

The Chairman was correct.  Regardless of whether one regards entrepreneurial opportunity as only one factor or as the decisive factor in determining whether the drivers were independent contractors, FedEx surely had the right to introduce the evidence necessary to make its case.  *See* 29 C.F.R. § 102.64(a) ("It shall be the duty of the hearing officer to inquire fully into all matters and issues necessary to obtain a full and complete record . . . ."); *cf. Drukker Commc'ns, Inc. v. NLRB*, 700 F.2d 727, 733 (D.C. Cir. 1983) ("It is repugnant to notions of fairness for the government to seek sanctions for alleged wrongdoing while withholding from the proceeding evidence that would demonstrate innocence.").

In support of her ruling, the Regional Director said only that "evidence of route sales and entrepreneurial activity at other terminals had no bearing on the economic value of route sales" at the Wilmington facilities.  Regional Director's Decision at 6.

Why that would be so, she did not say. Perhaps there is something special about the Wilmington facilities, especially as compared to others that are far away. But the Director did not identify what the idiosyncrasy might be, or say why at least evidence regarding nearby terminals would not be relevant. *See Burns Elec. Sec. Servs., Inc. v. NLRB*, 624 F.2d 403, 409 (2d Cir. 1980) (citing 29 C.F.R. § 102.64 in holding that the hearing officer erred in excluding evidence regarding the functions of certain workers at a nearby facility not within the proposed unit).

The exclusion of FedEx's evidence appears particularly arbitrary because the Regional Director did consider other evidence regarding some terminals not at issue in this case. *See* Regional Director's Decision at 4-5. So did the Board in *Roadway III*, where it relied on nationwide data to conclude that drivers were *not* independent contractors. *See* 326 N.L.R.B. at 851 (noting that "only 3 out of Roadway's 5000 drivers nationwide" had "used their vehicles for other commercial purposes"); *id.* at 853 ("In a system of over 5000 drivers assigned to over 300 terminals, we find that these few forced sales, given their circumstances, are insufficient to support a finding of independent contractor status."). And so, too, did a different Regional Director in *RPS, Inc. See* Decision and Order, N.L.R.B. Case No. 5-RC-14905 (Region 5, Aug. 3, 2000). That Regional Director relied on systemwide data to conclude that an employer's drivers *were* independent contractors. Although no driver at the only facility at issue in that case used his vehicle for commercial purposes unrelated to RPS's business, the Director found persuasive the fact that systemwide "many RPS drivers/contractors, possibly half" did so. *Id.* at 56. That record, the Director said, made it "clear that drivers/contractors can realistically take advantage of a myriad of entrepreneurial activities." *Id.* at 57.

In sum, the Regional Director's failure to reasonably explain her refusal to permit FedEx to prove its case requires that we grant the petition for review and remand the case.

IV

My colleagues conclude that, "[b]ecause the indicia favoring a finding [that] the contractors are employees are clearly outweighed by evidence of entrepreneurial opportunity, the Board cannot be said to have made a choice between two fairly conflicting views." Slip Op. at 20. They reach this conclusion by giving the entrepreneurial opportunity factor a weight, and analyzing it in a way, that the common law of agency -- as construed by the courts and the NLRB -- does not. Although the indeterminate nature of the common-law test may be problematic, and although the Board may have some room to modify it, this court cannot. Because the Board's decision reflects a "choice between two fairly conflicting views," we cannot displace it. *United Ins.*, 390 U.S. at 260.

We can and should, however, reject the Board's unexplained refusal to give FedEx a fair opportunity to make its case under the appropriate test. Accordingly, I would remand the case for further proceedings.